# CHARLESTON.

HEROLD *et al.* v. BARLOW.

Submitted Januray 24, 1900.—Decided April 7, 1900.

1. CONVEYANCE—*Insolvent Consideration—Fraudulent—Void.*
   A conveyance, in consideration of an antecedent debt, from an insolvent to his creditor, without fraudulent intent in the

creditor, though the creditor know of the debtor's insolvency, does not, alone, stamp the conveyance as one fraudulent in fact and utterly void; but it stands for the benefit of all creditors, including, the one thus preferred.　(p. 754).

2. INSOLVENT DEBTOR—*Grantee—Cash Payment.*

A conveyance by an insolvent debtor so a *bona fide* grantee, for valuable consideration, not a debt, is valid, and not subject to be held a preference under Code 1891, chapter 74, section 2; and if the consideration is part cash, and part an antecedent debt due from the insolvent to the purchaser, the conveyance will be held as a preference inuring to the benefit of all creditors of the insolvent, beyond the cash payment; but the purchaser will be preferred, to the extent of such prior liens on the property, he will be substituted to such cash payment over general creditors.　(p. 754)

3. INSOLVENT—*Conveyance—Preference—Purchaser.*

In a conveyance by an insolvent debtor, operating, under Code 1891, chapter 74, section 2, as a preference, and standing for the benefit of all creditors, if the purchaser discharge liens, and accorded their priority.　(p. 755).

4. INSOLVENT DEBTOR—*Creditors—Purchaser—Liens.*

In a conveyance by an insolvent debtor, operating, under Code 1891, chapter 74, section 2, as a preference, and standing for the benefit of all creditors, if the purchaser pays off debts of the insolvent, at his request, as part of the consideration, though such debts are not liens, they will be treated as if cash paid by the purchaser, and he will have preference therefor over other general creditors.　(p. 762).

5. ACTION—*Limitation—Laches—Preference.*

A suit to overthrow a conveyance made prior to February 20, 1895, as a preference prohibited by Code 1891, chapter 74, section 2, will be barred by laches, unless excused.　In this instance, the conveyance being on record, a delay of four years and four months was held to bar such suit.　If such a conveyance since that date, suit must be brought within one year from its date, and, if recorded within eight months after its date, the suit must be within four months after such recordation, under chapter 4, Acts 1895.　(p. 763).

Appeal from Circuit Court, Pocahontas County.

Bill by Andrew Herold and others against Amos Barlow and others.　Decree for plaintiffs, and defendant, Amos Barlow, appeals.

*Reversed.*

BROWN, JACKSON & KNIGHT, for appellant.

H. S. RUCKER, for appellees.

BRANNON, JUDGE:

On the 19th of September, 1891, and for a considerable time prior thereto, Horace M. Lockridge was engaged in the business of a real-estate agent, and buying and selling lots, at a town called "Buena Vista," in Virginia. Buena Vista is what is known as a "boom town," where lots at one time sold at fabulous prices, and then collapsed and fell to nominal prices, or became wholly unsalable. Lockridge had been raised in Pocahontas County, in this State, and went from there to Buena Vista, where he resided, and engaged in the business just stated. He dealt largely in lots at that place; bought and sold a great many; carrying on transactions quite large; handling a great deal of property. In addition to the real-estate business, he carried on a retail store. He became largely indebted to wholesale merchants for goods purchased for that store, and for purchase money on lots in Buena Vista. He owed bank notes in West Virginia. He owed divers people in the county of Pocahontas. He was very largely indebted on the 19th of September, 1891. Prior to that date judgments had been rendered against him in Pocahontas, which he could not pay. One of these judgment creditors (Sharp), if not others, was pressing him for payment; threatening him with chancery proceedings in Pocahontas to sell a valuable tract of land owned by him in that county. He owed also in that county a good many other debts, not yet carried into judgment. He owned two other parcels of real estate of smaller value, in Pocahontas; having liens resting thereon for purchase money. He owned the store in Buena Vista, worth about three thousand dollars. He owned a very considerable number of lots in Buena Vista, bought at high prices. Lots in that boom town had been, up to 1891, commanding high prices; but at some time prior to September 19, 1891, the boom or inflated prices of those lots suffered serious decline, and finally collapsed. Just when this decline began, the evidence does not distinctly say; but it is fair to say that it began prior to September 19, 1891, and that on that date

lots had already suffered very serious decline, and were then of slow sale at prices greatly reduced from their cost, —practically unsalable at that date. Lockridge states that he had in his various transactions in real estate prior thereto made a great deal of money, but that he had reinvested it in numerous lots, and that the collapse in prices caught him with them on hand, and thus ruined him, and the lots were sold from him for unpaid purchase money. He then owed a large indebtedness to parties in West Virginia, Virginia, and considerable in Baltimore. The evidence makes it clear that on the 19th of September, 1891, he was greatly distressed for money; judgments against him threatening his land in Pocahontas County; his Buena Vista lots under liens for unpaid purchase money, which he could not pay; and thus the lots were in certain and imminent danger of being sold under trust deeds made to secure the purchase money. He was already sued in Virginia for debts, and was in imminent danger of further suits there. His creditors were clamorous and uneasy. He was surely insolvent on the 19th of September, 1891. It is useless to detail evidence under this head. It would be a mere detail of mere evidence, illustrating no legal principle, and I will not detail the volume of circumstances touching his insolvency. He states under oath that he was then insolvent, but it does not need his admission to show such to be the fact. The great number and volume of his debts, and the transparent fact that his property would not pay them, as so much was unsalable and unavailable, and soon came to nothing, as he states, coupled with the fact that he soon transferred his store to his wife, and that his lots were sold away from him for purchase money,—these facts and many other circumstances tell too plainly of his financial collapse. His insolvency is not a probability, but a strong probability,—a certainty. When he sold his farm in Pocahontas, the debts appeared large,—those in West Virginia,—and the Virginia and Baltimore debts were large; and his Virginia lots were utterly inadequate to pay them, and those debts remain yet unpaid. All these circumstances existing on the 19th of September, 1891, and revealed by subsequent events given in evidence, show beyond question that Lockridge was inso

vent, in a legal sense, on that date; that is, all his property was not then adequate to pay all his debts. He was not only insolvent in the sense of the bankrupt law, on account of his failure and utter inability to meet his obligations in due course of maturity, but he was insolvent within the meaning of our statute against preferences; that is, all his property would not pay all his debts. *Weigand* v. *Supply Co.* 44 W. V. 133, (28 S. E. 803). By deed dated September 19, 1891., Lockridge conveyed to Amos Barlow and Henry Barlow the said valuable tract of land in Pocahontas County for the consideration of twelve thousand dollars, as stated in the deed, but which was in fact eleven thousand dollars, as all admit. This consideration was paid partly in antecedent debts due from Lockridge to the Barlows. It was partly paid by the transfer to Lockridge's wife of three thousand five hundred dollars of stock of a corporation doing a real estate business at Buena Vista, called the Pocahontas and Greenbrier Investment Company, of which Amos Barlow and his wife owned two thousand five hundred dollars, and C. R. Moore, a son-in-law of Amos Barlow, owned one thousand dollars. As further payment, the Barlows discharged various liens recorded and binding the said land, and they also paid a very considerable amount of other debts against Lockridge, at his request, and they paid him cash two hundred and one dollars, and some taxes on the land; and for the balance, of one thousand one hundred and twenty-nine dollars and twenty-nine cents, Amos Barlow gave to the wife of Lockridge a check on a bank. The said deed from Lockridge to the Barlows named Lockridge and his wife and his mother (the last owning a dower right in the land) as grantors. It was acknowledged and executed by Lockridge and his mother on its date, and recorded September 21, 1891. That deed was not executed by the wife of Lockridge, but this was cured by another deed, dated September 22, 1891, executed and acknowledged in Virginia; she being there. and not in Pocahontas County, where the former deed was executed. On the 6th of January, 1896, Andrew Herold attacked this conveyance by a bill in equity in the circuit court of Pocahontas County, claiming that the said conveyance from Lockridge to the Barlows was made with the purpose and

intent to hinder, delay, and defraud the creditors of Lock-
ridge, and, if not made with such purpose and intent in the
mind, it was made when Lockridge was insolvent, and
that said conveyance should, under that provision of Code
1891, chapter 74, section 2, forbidding a preference of cred-
itors, be held to be for the common benefit of all the cred-
itors of Lockridge. Herold's bill states that he was Lock-
ridge's indorser on certain notes, and that Mathews, as
their holder, had obtained judgments on the same for up-
wards of nine hundred dollars, and that on another note,
on which Herold was Lockridge's indoser, a decree had
been obtained by Dennis for one thousand four hundred
and sixty-one dollars and fifty cents, which debts ante-
dated the said deed. In this suit a decree was entered'
holding that, when the said conveyance from Lockrigde to
the Barlows was made, Lockridge was an insolvent debtor,
and that the said deed was an attempt to give preference
to certain creditors to the exclusion and prejudice of oth-
ers, and that the said conveyance was void, and that the
said conveyance should be held as made for the benefit of
all the creditors of Lockridge. From this decree Amos
Barlow, to whom Henry Barlow had conveyed his interest.
in said land, took an appeal.

1. Is the conveyance from Lockridge to the Barlows
fraudulent in fact? This is an important question, be-
cause, if fraudulent in fact, it would be utterly void, and
the Barlows would save nothing from the wreck. At the
threshold of this question, we must remember a very ma-
terial fact, of controlling effect in law. The Barlows had
honest debts against Lockridge. By the common law it is,
perfectly lawful in a creditor to obtain, and in a debtor to
give a creditor, preference over other creditors, if the in-
tent is merely to prefer a creditor, and not to hinder or de-
fraud other creditors. Such preference may injure, but
it does not defraud, other creditors. It makes no differ-
ence how zealous, how urgent, that creditor may be to
save himself by securing such preference. It makes no
difference that such preference even absorb or exhausts
the property of the debtor, leaving nothing for other credi-
tors. It makes no difference about the secret motives of
the creditor, as the law takes no cognizance of such mo-

tives, and cannot assign a bad motive to an act not wrong either in itself or in its consequences, because, in law, a motive having a lawful end in view, and resulting in proper action, not condemned by law, cannot be called a bad motive. Here self-preservation is regarded as the law of nature. It makes no difference that the creditor knows that the party is insolvent when he gets his preference. It makes no difference that the creditor apprehends attachment or other legal proceedings by other creditors, and is therefore moved to diligence and astuteness in getting ahead of other creditors, and obtaining a preference before other creditors attach, and thus defeat their attachment. He defeats other creditors lawfully to save his own honest debt. He simply uses diligence to save himself, and the law rewards that diligence by giving him its fruits. *Harden* v. *Wagner*, 22 W. Va. 356; *Skipwith's Ex'r* v. *Cunningham*, 8 Leigh 271; Bump. Fraud. Conv. §§ 165, 167, 168, 170, 171, 183; Wait, Fraud. Conv. § 390. For a collection of cases to sustain these principles, I would cite that very valuable late work, 1 Am. & Eng. Dec. Eq. 148, 149. It is immaterial how such lawful preference is accomplished,—whether by absolute conveyance of the fee, or by mere mortgage or judgment. Under these principles of law, we cannot convict the Barlows of intentional fraud from the fact, alone, that they by that deed obtained preference for their debts over other creditors. I say "intentional fraud;" for though, under the Code provision forbidding preferences by an insolvent, a deed may be held to be a conveyance for the benefit of all creditors, because it is a preference forbidden, yet this is not because it is fraudulent in fact,—intentionally fraudulent as against other creditors,—but only fraudulent in law, or, rather, not fraudulent at all, but simply a conveyance operating as a trust for the benefit of all creditors. The mere fact that it is a preference does not make it corrupt. As the law before the statute allowed such preference without attributing fraud to it, such is still the nature of the act, so far as fraud in fact is concerned. The statute does not stamp it as fraudulent in fact. But for this consideration, there are facts and circumstances in this case which would stamp the transaction with fraud. For instance, a letter

from Amos Barlow to Lockridge, August 24, 1891, saying:
"Bro. Henry came here today, and asked me to write to
you privately, and wanted me to go in with him and sell
out to you all that we had at Buena Vista,—include the
bond vs. you and I. B. M., lift the liens vs. your land, and
take a deed of trust on said farm; he or us to raise you as
much money as possible to help you out there. Now, if
there is any way to make things better, so as not to hurt
either you or us, let us know, as he says he will raise the
money to suit you as soon as possible, but would have to
have time to collect and borrow. He says he is tormented
by somebody near home, and is going to close out at Buena
Vista some way; he is nearly wore out by the harangue.
I agreed to join him in anything he and you do. So, if
there is any way you can buy us out and be safe yourself,
let us know at once. Private." This letter is appealed to
as strong evidence of fraud, but, in the light of the law
principles above stated, it is not.

Amos Barlow and wife and a son-in-law, Moore, owned
three thousand five hundred dollars stock in the Pocahon-
tas and Greenbrier Investment Company, operating at
Buena Vista, of which company Lockridge was president
and a large stockholder. The Barlows clearly felt unsafe
about its solvency (I mean, the worth of the stock), and
they were anxious to dispose of it, so as to save it. Henry
Barlow had invested, through Lockridge, in a lot at Buena
Vista, which he later sold to Lockridge & Adams, part-
ners, for which the purchasers were to assume the pur-
chase money debt, of six hundred dollars, due from Bar-
low, and thereafter pay him one thousand one hundred and
sixty dollars. Henry Barlow felt anxious about this matter.
The Barlows, as appears from the letter above, wanted
to sell Lockridge this stock, and secure its price by a deed
of trust on the farm in Pocahontas, and also secure the
debt due to Henry Barlow on the Buena Vista lot, in a
trust on said farm, and also secure in like manner a bond
of one thousand dollars due Henry Barlow from Lockridge.
To accompilsh these things, they were willing to advance
some money for Lockridge's relief. They had the right to
do all this. They could sell the stock to Lockridge, and
secure its price on the farm. The fact that they wanted

it kept private does not brand fraud upon the transaction, as they had the right to act in privacy in a lawful business transaction. And it is explained in the evidence that such privacy was desirable on the part of one of the Barlows, because his wife was very much dissatisfied about his investments at Buena Vista through Lockridge. This letter unquestionably shows that the Barlows knew of Lockridge's financial embarrassment, but the law says that knowledge of even insolvency of a debtor will not vitiate a preference. Evidence shows that one of the Barlows asked a lawyer whether judgments in the Federal court against Lockridge would be liens on the Pocahontas land. He also apprehended that there might be an attachment for Virginia debts. But authorities cited above will show that a creditor may take a preference to save himself, even though he is sure that the next day an attachment will be levied. If he does no hurt to other creditors, beyond taking a preference. his preference stands good and unstained with fraud. The consideration stated in the deed is twelve thousand dollars, whereas the actual consideration was eleven thousand dollars; but it is fairly shown that this circumstance was accidental, not intentional. The price demanded by Lockridge was twelve thousand dollars, and the attorney who drew the deed, when told that the parties had consummated their deal, assuming that that was the consideration, so stated it in the deed. The mistake was observed by one of the Barlows, and he wanted it changed, but Lockridge persuaded him that it would make no difference; remarking that, if anything should come against the land, it would be better to have the larger consideration stated. This is a circumstance against Barlow, but only a circumstance, and is not conclusive of fraudulent intent, as Barlow showed a desire to have the true amount stated; showing that he had no bad intent. It is urged that great haste in recording the deed was shown. It was executed Saturday evening, late, and had to be taken into the country four miles, to be executed by Lockridge's mother, and was to be returned and recorded that night, but came too late. The deed was to be delivered to Baxter, a young man, nephew of the Barlows, and a clerk in the store of one of them; he having made up the compli-

cated account of items entering into the consideration. He was to receive this deed when it should be returned, for the Barlows, and put it on record. The lawyer who drew the deed and was to pass on its sufficiency, and who was the notary who went to the country to take the acknowledgment of Mrs. Lockridge, handed it to Baxter on Sunday morning, with the cautionary remark that the deed should be recorded at an early date, as it would be necessary to do so, if Baxter knew the parties to the deed as well as other people did; referring, as Baxter thought, to Lockridge. Baxter says this moved him to record the deed promptly, and he procured the clerk to admit it to record between three and four o'clock Monday morning. It seems that Baxter was up very early, mailing some letters, as the mail left very early. Now, all this was in the absence of the Barlows. One of them had merely said to Baxter, if the deed was returned in time Saturday night, to see if it had been acknowledged; giving him no directions as to recording it. But what if the Barlows had themselves directed this prompt recordation? Under the law above stated, they had the right to do so. May not a purchaser promptly record his deed? As we have above seen, a man may obtain a preference, if he fears an attachment by another creditor to be imminent; and surely he can record his deed at once, to save himself from such attachment. If the deed is valid, its hasty recordation cannot invalidate it.

There is a circumstance which tends pretty strongly against the Barlows under this head of actual fraud. It is the only circumstance that has any appreciable weight with me towards branding the transaction with actual fraud on the part of the Barlows. While the law allows a man to purchase, *bona fide*, property from an insolvent, or to take any steps necessary to save himself by preference, he must do so without intent further to harm others than his mere purchase or preference. "A transfer may be fraudulent, although it is made in consideration of an honest debt, for an honest claim may be used as a cover to a covinous transaction. The distinction is between a transfer made solely by way of preference of one creditor over others, and a similar transfer made with a design to

secure some benefit or advantage therefrom to the debtor, or to delay creditors in the collection of their debts." Bump. Fraud. Conv. § 172. A balance of the consideration of the conveyance going to Lockridge after the abatement of the stock in said company, liens and debts paid by Barlows, and payment of debts due them from Lockridge, and the sum of two hundred and one dollars paid him in cash, which balance was one thousand one hundred and twenty-nine dollars and twenty-five cents, was paid by the check of one of the Barlows to Lockridge's wife, and one thousand seven hundred dollars of said corporate stock was some time afterwards transferred to his wife; and a lot in Buena Vista, which had been sold in June, 1891, by Henry Barlow to Adams & Lockridge was also conveyed October 8, 1891, to the wife of Lockridge. It seems that the transfer of the stock to Mrs. Lockridge was not agreed upon at the date of the transfer ot the farm by Lockridge to the Barlows, but was an afterthought of Lockridge; and the Buena Vista lot had been sold by Henry Barlow to Adams & Lockridge long before, and the debt therefor due Henry Barlow was a part of the consideration for the farm, and the lot was, by after request of Lockridge, conveyed to his wife. These things do shade the transaction with the look of bad intent on the part of the Barlows, because they tend to show that they not only wished to convert their stock and debts against Lockridge into this farm, and thus save themselves, which they lawfully might do, but were aiding Lockridge in screening the balance of the purchase money and some of the stock and the Buena Vista lot from others creditors, by conveying them to Lockridges wife. But are these circumstances sufficient to overthrow the deed? They verge upon it, but the law says that fraud in fact must be clearly and fully proved. If these circumstances stood alone, they might be sufficient to invalidate the transaction, but they lose force when connected with the fact that the Barlows were doing only a lawful act in securing themselves. These circumstances are not sufficient to overthrow the transaction. I have no doubt that Lockridge intended to sell that farm, prefer his Pocahontas friends, get some money from it, and screen it from his creditors, as well as any other

property he could likewise save to his wife; but his intent, though fraudulent, will not destroy the Barlows, unless we can fix upon them, by such full proof as the law requires to establish fraud, notice of Lockridge's fraudulent intent. And just here there occurs to me a proposition of law which goes far to sustain this action of Lockridge in having the check and transfers made to his wife, and considerably relieves this apparent badge of fraud. In the case of *Glascock* v. *Brandon*, 35 W. Va. 84, (12 S. E. 1102), it is held that, if a married woman relinquishes her contingent dower under a promise at or about the time by her husband that other property shall be settled on her in compensation for such relinquishment, the settlement will be good against creditors having no specific lien, up to the value of the dower right relinquished. It may be that in this case the property transferred to the wife is in excess of her contingent dower. That would be a matter in a suit between the creditors and Mrs. Lockridge. The transfer would be good to the extent of her dower, and for the excess it would stand for creditors. I use this view in this case to show that, in a legal point of view, it detracts from the force of such transfer to the wife as evidence to sustain the charge of fraud in fact. It goes far to relieve the tinge upon the transaction which at first blush is caused by the transfer of the stock and Buena Vista lot and check to Mrs. Lockridge. Lockridge swears that the check for the balance of purchase money was made to his wife in consideration of her expectant dower, and I do not see that that would be excessive as a compensation for her expectant, contingent dower. As for the transfer of the stock and lot to Mrs. Lockridge, I think that was not arranged at the date of the deed, but a subsequent arrangement; and, if so, it could not retroact, and make the deed, if valid at its date, invalid. So I have concluded that the deed from Lockridge to the Barlows cannot be overthrown for fraud in fact. I will not say that this conclusion is absolutely clear to my mind, but it is more satisfactory than would be an opposite decision. I have detailed circumstances too much. Though practiced, it is wrong to incumber opinions with details of evidence or circumstances. A judge, however, often does so, feeling that counsel expect it. It

is, in my opinion, very objectionable practice. An opinion full of mere facts is no precedent in other cases. An opinion should merely state results or conclusions from the evidence, and state the legal propositions; for it is the purpose of opinions to state law, that it may be used in future cases, and not detail mere evidence.

2. The conveyance from Lockridge to the Barlows, though not fraudulent in fact, is partially a preference by an insolvent debtor, and in law would inure to the benefit of all creditors, under Code 1891, chapter 74, section 2, because, when made, Lockridge was clearly insolvent. The Barlows were fully apprised of Lockridge's financial embarrassment, if not of his total insolvency; but that is immaterial, as his mere insolvency brings the deed under said Code provision, whether the Barlows knew of it or not. *Wolf* v. *McGugin*, 37 W. Va. 552, (16 S. E. 797). I think therefore, that so far as regards all the debts due from Lockridge to the Barlows, including the debt on the lot in Buena Vista, the said deed was simply a preference. I think that as to the cash paid, and the transfer of the stock in the Pocahontas and Greenbrier Investment Company, it is not a preference, under the statute, but is to be regarded a sale, and that, if the court were in the situation to declare the deed a preference, the Barlows would be given preference out of the proceeds of a sale of the farm, if one could be ordered. And why? Because the said statute does not at all prohibit a sale by even an insolvent, but only a preference. It innovates upon the common law only so far as to forbid an insolvent from preferring particular creditors. If a man purchase of an insolvent a farm at one thousand dollars cash, *bona fide*, the deed is good. If he pays nine hundred dollars of it in cash, and one hundred dollars in an antecedent debt due from grantor to grantee, reason and justice require that so far as the transaction is a cash purchase, valid under the law, it should stand good, and, so far as it is a purchase with an antecedent debt, it is a preference under the statute, and, if the farm be sold by the court, the purchaser should get his nine hundred dollars back first, and the residue should go to all creditors, including the purchaser, for his one hundred dollars. This carries out the statute,—goes as

far as it intended to go,—and adjusts the equities between the parties conformably to the intent of that statute. So we have held in *Carr* v. *Summerfield*, 34 S. E. 804. Those debts which were liens on the land at the date of said deed would go to the benefit of the Barlows, by subrogation. They stood good against other creditors of Lockridge, and the Barlows, having paid them off, would occupy the shoes of the owners of such liens. That would do no wrong to other creditors, as they were already subject to such liens. I think, too, that as the Barlows paid to Hevner and others, who were general creditors of Lockridge, valid debts, the Barlows would get the benefit of them over other creditors even. Why? Because those creditors could lawfully receive cash in payment of their debts, and also because the Barlows furnished cash to pay them; and this is just the same as it would be if paid to Lockridge.

3. Under the principles above stated, Herold and other creditors of Lockridge would be entitled to part of the relief they seek by having the court sell the farm conveyed by Lockridge to Barlows, but for the bar of laches. Section 2, chapter 74, as found in the edition of the Code of 1891, gives no limitation to a suit to set aside a preference. I know of no statute that does, operative at the date of the conveyance in question. This statute I consider eminently just, because it gives all just creditors, except lienors, an equal share, ratably, in the property of an insolvent debtor. Still, it is an innovation upon the antecedent law in the Virginias, and generally in this country, which allowed preference even by an insolvent. This statute is somewhat dangerous for business men. It will overturn many instances of transfer made in good faith in the every day transaction of honest business, where the transferee had no idea of insolvency. It overturns honest transactions. These consideration call loudly upon a court to say that those who would assail such a conveyance must not sleep upon their rights, but act promptly. Where actual fraud exists, the grantee may justly suffer the penalty of making amends after a long time; and even there I think there should be a statute of reasonable limitations, though the case be one of fraud, as things should sometimes have an end. But in the case of a deed not fraudulent, but void

simply because it is a preference of an honest debt, where
the common law gave entire freedom of preference, I think
parties should act with great promptness. They ought
not to be allowed to delay in their assault upon a transac-
tion free from moral taint. They ought not to be allowed
to revolutionize things honestly done, and so bring disas-
ter on others, after a long time, when the parties had gone
on to make improvements and taken other steps on the
faith of the validity of the transaction. There being no
statute of limitations, it is simply a question of laches, in
equity. What time shall be given? That depends on the
circumstances of each case. The deed was put on record
at once.—open to the world. Presumably, the parties inter-
ested lived in Pocahontas, and had knowledge or means of
knowledge of the transaction. It will not do for the plain-
tiffs to say that the facts were peculiarly within the knowl-
edge of the Barlows and Lockridge, because the plaintiffs
are called on to glean information touching their rights by
diligent inquiry and the adoption of means proper to that
purpose, as all business people are. They could sue and
call upon their adversaries for a discovery under oath.
As said in *Lafferty* v. *Lafferty*, 42 W. Va. 792, (26 S. E.
265): "And the law is, where one has means of knowledge
of a fraud, or sufficient notice to put him on inquiry, it is
enough to count time against him. Kerr, Fraud. & M. 310.
Where he has means of knowing or ascertaining, where he
is put on inquiry, where ordinary prudence for his inter-
ests suggests that he inquire, he must do so, or else time
runs. Opinion in *Thompson* v. *Iron Co.*, 41 W. Va. 574,
(23 S. E. 795), and cases there cited. * * * The
United States supreme court said: 'The defense of want
of knowledge on the part of one charged with laches is one
easily made, easy to prove by his own oath, hard to dis-
prove; and hence the tendency of the courts in recent
years has been to hold the plaintiff to a rigid compliance
with the law which demands, not only that he should have
been ignorant of the fraud, but that he should have used
reasonable diligence to have informed himself of all the
facts. Especially is this the case where the party com-
plaining is a resident of the neighborhood in which the
fraud is alleged to have taken place." *Foster* v. *Railroad*

*Co.*, 146 U. S. 99, 13 Sup. Ct. 32, 36 L. Ed. 903. In the case
of *Broderick's Will*, 21 Wall. 519, 22 L. Ed. 603, the same
court said: 'They do not pretend that the facts of the
fraud were shrouded in concealment, but their plea is that
they lived in a remote and secluded region, far from means
of information, and never heard. * * * Parties cannot
thus, by their seclusion from means of information, claim
exemption from the laws that control human affairs, and
set up a right to open all transactions of the past. The
world must move on, and those who claim an interest in
persons or things must be charged with a knowledge of
their status and condition, and of the vicissitudes to which
they are subject.'" If such is the rule in cases of fraud
in contracts, is there not more reason in calling for prompt
action to overthrow a deed deemed honest in law, and only
objectionable because of its preferential character? On
this subject of laches, see *Pusey* v. *Gardner*, 21 W. Va.
470; *Trader* v. *Jarvis* 23 W. Va. 100; *Newcomb* v. *Brooks*,
16 W. Va. 32 (Syl., point 10). In *Williams* v. *Maxwell*, 45
W. Va. 297, (31 S. E. 909),—a case to set aside a sale for
fraud,—JUDGE, McWHORTER discusses the subject of
laches quite elaborately; citing many authorities that en-
force the duty of diligence upon him who would set aside
a deed for fraud. But I repeat that the case of a mere
preference, free from actual fraud, calls still more loudly
for the requirement of a suit within a short time. This
suit was delayed too long,—four years and four months.
The *Williams Maxwell Case* said three years was too long.
The public policy demanding, under this statute, speedy
suit, is very plain; but I am the more inclined to come to
the conclusion that this suit was delayed too long from the
fact that the legislature, in chapter 4, Acts 1895, enforces
this policy, by demanding that a suit to set aside a prefer-
ence be brought within the short time of one year, and, if
the deed be admitted to record within eight months, the
suit must be brought within four months after such rec-
ordation. That statute does not retroact and apply to
this case. *State* v. *Mines*, 38 W. Va. 125, (18 S. E. 470).
But it calls upon us to enforce such policy by saying that
this suit was too long delayed. Our conclusion is to re-

verse the decree and dismiss the bill.   Costs against An-
drew Herold, Witz, Beidler & Co., Gugenheimer & Co., and
Armstrong, Cator & Co.

*Reversed.*