# CHARLESTON.

## TETER *v.* IRWIN.

Submitted March 1, 1910.   Decided April 18, 1911.

1. ATTORNEY AND CLIENT—*Termination of Relation —(Death of Client.*
   Death of a client ends the power of his attorney at law. (p. 203).

2. ABATEMENT AND REVIVAL—*Consent of Heirs of Deceased Defined.*
   Revival' of a cause against heirs of a deceased defendant by consent of such heirs dispenses with process to revive and makes them parties. (p. 202).

3. JUDGMENT — *Consent Decree Given by Attorney — Vacation — Burden of Proof.*
   To overthrow a decree by consent given by an attorney at law on the ground of his want of authority, the burden to prove such want is on the party asserting it, and must be clear and full. (p. 205).

4. JUDICIAL SALES—*Conclusiveness.*
   One about to purchase property under a decree of a court having jurisdiction is not bound to inquire into the authority of an attorney representing a party. (p. 206).

5. ATTORNEY AND CLIENT—*Authority of Attorney—Consent to Decree by Client.*
   The relation of client and attorney at law authorizes the attorney to consent to a decree binding his client. (p. 207).

6. SAME—*Authority of Attorney—Evidence.*
   Authority of an attorney to act for his client in consent by the attorney to a decree binding his client may be shown by the conduct of the client, his acquiscence therein or other circumstances proving it. (p. 208).

7. SAME—*Unauthorized Acts of Attorney—Acquiescence by Client.*
   If an attorney at law act without authority in consenting to a decree, and the client afterwards recognize his authority, or, with knowledge of it, acquiesce in it, and make no objection to it when he knows that other persons are acting upon faith of the attorney's authority, it is a ratification making the decree binding on the client. (p. 209).

Appeal from Circuit Court, Barbour County.

Bill by Daniel P. Teter and others against James Irwin and others. Decree of dismissal, and plaintiffs appeal.

*Affirmed.*

*J. M. N. Downes,* for appellants.

*Blue & Dayton,* for appellees Teter and Valley Coal & Coke Company.

BRANNON, JUDGE:

Joseph Teter owed a large and valuable estate in lands in Barbour county. He became deeply involved in debt, so that we may regard him at his death as utterly insolvent. Two chancery suits were brought against him. One of them was brought by Samuel Woods to subject a tract of 303 acres of land known in this cause as the "R. T. Talbott farm," to a purchase money lien. He also owned other tracts of 939 acres, 260 acres and some coal interests. The other suit was brought by Crimm, the holder of various judgment liens, to subject Teter's land to the payment of liens. This was a creditor's lien suit. In Teter's lifetime an order of reference was made in the Crimm suit referring the case to a commissioner to ascertain liens against Teter. Before a convention of lienors was made under this order Teter died intestate leaving a number of sons and daughters. In February, 1899, an order was made reviving the Crimm case against the administrator and heirs of Teter. This order was made by consent of said administrator and heirs, which consent was given by Charles F. Teter, one of the heirs, acting for himself, and as attorney-at-law for other heirs. Charles F. Teter acting for himself and his co-heirs made a contract with James Irwin selling the "R. T. Talbott farm" for $12,000. This contract was reported to the court, and by a decree entered in the two causes of *Woods* v. *Teter's Heirs* and *Crimm* v. *Teter's Heirs* this contract was approved and confirmed, and a deed directed to be made to Irwin. Irwin paid the money to the court and the land was conveyed to him by deed, 6 June, 1899. This decree was made 2d June, 1899, upon a consent given by Charles F. Teter and Fred O. Blue as attorneys for the heirs. Charles F. Teter for himself and co-heirs made a contract with N. T. Arnold selling at nine dollars per acre

all coal and minerals, except oil and gas, in other lands of Joseph Teter aggregating about 2,000 acres. This contract was reported to the court, and by decree 18th October, 1899, was approved and confirmed by the court. This decree was upon consent of the heirs given by Charles F. Teter and Fred O. Blue, as attorneys-at-law for them. A deed was made to Arnold for such coal under decree of court dated 18th November, 1899, the total price for the coal being $14,136.48. Irwin conveyed 31st May, 1900, the "Tablott farm" to the Southern Transportation Company and it made very extensive and costly coal developments and improvements upon it. Arnold conveyed the coal which he acquired to Valley Coal & Coke Company. In May, 1902, Daniel P. Teter and others of the children and heirs of Joseph Teter filed a bill in equity against Irwin, Southern Transportation Company, the Valley Coal & Coke Company, Arnold, Charles F. Teter and others to annul the decrees made in the said causes of *Woods* v. *Teter's Heirs* and *Crimm* v. *Teter's Heirs*, reviving them against the heirs of Joseph Teter and confirming the sales to Irwin and Arnold above stated. The ground of this suit was upon the allegation that Charles F. Teter and Fred O. Blue had no authority as attorneys to represent the heirs of Joseph Teter, or revive the causes, or to consent to the decrees approving and confirming the sales to Irwin and Arnold. The bill is upon the theory that those heirs were never parties to the suit, because there was no revival process served on them and they did not appear, and that the court had no jurisdiction over them, and therefore the decrees were void. The result of this suit was a decree dismissing the bill, from which Daniel P. Teter and others appeal.

Did these complaining heirs appear in the case? The suits were pending in the lifetime of Joseph Teter. Of course, his death suspended them and revival against the heirs was necessary. Though no process of revivor was served on them, yet if they appeared by an authorized attorney, that dispensed with such process and they became parties to the cause. The great, the decisive question, then, is, Did Charles F. Teter have authority to appear for them? Did he and Fred O. Blue have authority to appear for them and consent to the sale to Irwin and Arnold? Charles F. Teter, one of the heirs, was a practicing lawyer, the only lawyer of the family. His evidence

and claim is that he had been his father's attorney during his father's lifetime in the suits pending against him, and counsel say that that fact authorized him to continue as attorney and represent them as heirs. This proposition we cannot admit. True, we are cited to 4 Cyc. 938, a very reliable work, stating that "Where revival is merely a matter of procedure the attorney may consent to revival after the death of a party." Referring to the one authority there cited, *Clark* v. *Parish,* 1 Bibb 447, we find it explicitly holding that by the death of the client the power of his attorney is gone, and asserting in broad language that it is clear that it would have been unwarrantable assumption of power in the attorneys to attempt by their consent to revive the suit; but the court said that from the ambiguity of the order it could not say but that the attorneys represented the executor, and therefore held the revival good  We are also cited to *Wilson* v. *Smith,* 22 Grat. 493, saying that in a suit for partition the counsel employed by the ancestor will be presumed to be continued as counsel, and that a decree for sale upon his consent is valid. To the same effect we are cited *Marrow* v. *Brinkley,* 85 Va. 62, 6 S. E. 606. We cannot hold that the powers of an attorney of a client continue after the client's death. The law is very decided to the contrary. "The death of the client, or, in case of a corporation or partnership, its dissolution, operates as an immediate termination of the relation; although the case for which he was employed may be still pending, the attorney has no authority to appear for the heirs or the personal representative unless employed by them." To the same effect see 4 Cyc. 953.

The grave question then is, Were Charles F. Teter and Fred O. Blue retained as attorneys-at-law by and for the heirs? Upon this vital question we have hundreds of pages of printed evidence from many witnesses, and in irreconcilable conflict. It comes chiefly from members of the family, witnesses deeply involved in self interest. Charles F. Teter swears that on the day after the funeral of his father, at his home, the children, except two, held a conference in which the affairs of the estate were talked over; that it was known to all that the estate was deeply indebted and that those suits were pending; and that it was agreed that Charles F. Teter, being the only lawyer member of the family, should act as administrator, but while

he declined to do this he agreed to act as counsel for the estate, and for his brothers and sisters, and explained to them how the suit would ordinarily have to be revived by *scire facies,* but that he could appear for them all and save costs by consenting to a revival, and that this course was agreed upon, not exactly as a formal conference, but as simply a family talk as brothers and sisters would have upon such an occasion; and that in pursuance of such understanding he consented to the revival, and that he felt that he was empowered to act for the children in the complications of the estate springing from these circumstances. Is this version of Charles F. Teter, under the solemnity of his oath, plausible, reasonable? A reading of the voluminous record of this case, considering the circumstances in which the estate stood, and as the parties stood (which we may consider), I think would answer this question to almost any mind in the affirmative. Reflect that the father was just dead, and his estate embroiled in consuming debts, with two suits pending against it involving costs and devouring interest; that the land must be sold in them was beyond question; that a revival of the suits was inevitable; that there was no disputing of the many debts against it, which would probably consume it; that by speedy action the estate might be made to pay out and leave something from the wreck, but at that time this was doubtful What more natural than that the heirs wanted to save expense of revival, and would want the suit to be proceeded with and the land sold? It had to come to this. There was no evasion of this result. Is it not reasonable to say that these brothers and sisters, who were then in friendship, would consent that Charles F. Teter should take these matters pending in suit in hand and do the best he could for all under such troubling circumstances? I state these things as showing to reasonable men that it is probably that Charles F. Teter's oath in this matter is true and it is corroborated by some other members of the family. This is rendered probable by other considerations which I state as supplemental to those just mentioned. All the members of the family lived on or close to these lands, except two in the West, and they visited Barbour county and were informed of what was going on. Is it probable that these heirs would not keep an eye on what was being done with this fine landed estate of their father? What

was being done? The suits were revived in open court.
Charles F. Teter, as we may plausibly say, struggling to sell
the property at private sale by advantageous contract to keep
the property from a sacrifice sale under the hammer, made two
important contracts selling a valuable farm to Irwin for the
large sum of $12,000, proven to be a large price, and selling the
coal in about sixteen hundred acres at nine dollars an acre, then
a fair price, and these contracts were reported to the open court
and there confirmed in the public hearing. Did these other
heirs know nothing of these things? How can they fairly say
they did not? Will reasonable men believe that they were in
ignorance of these doings so important to them? And they
let nearly three years go by after these important transactions
before they brought this suit So, we say, if we had to decide
on the oral evidence, that it seems plausibly established that
Charles F. Teter had the authority which he assumed, and was
acting in good faith for the best interest of all. But if differ-
ent men might differ on that question, then there comes the
rule in appellate courts that "where a decree is based upon
depositions conflicting and contradictory so that it is difficult
to determine on which side they preponderate, and hard to
draw proper decision therefrom, and different judges might
reasonably disagree upon the facts proved, the appellate court
will refuse to reverse the decree of the court below, although
the testimony may be such that the appellate court might have
rendered a different decree if it had acted upon the case in the
first instance." *Richardson* v. *Ralphsnyder,* 40 W. Va. 15.

Another principle must be remembered. This suit is an ap-
plication to overthrow solemn decrees of a court, two and one-
half years after they were made. The books say that when
an accredited attorney appears at the bar of the court as repre-
senting clients there is a presumption of his authority, and
after the court has acted the burden is upon the party denying
his authority to clearly show the want of authority. *Connell*
v. *Galliher,* 55 N. W. 229. The evidence must be clear. *Win-
ters* v. *Means,* 41 N. W. 157. This is held in *Lumber Co.* v.
*Lance,* 50 W. Va. 636. This overthrow of solemn proceedings
in an open court of the country is asked nearly three years
later after parties have purchased on the faith of their vitality
and spent hundreds of thousands of dollars in coal development.

Here it is apropos to quote from 1 Black on Judgments, § 325: "At any rate, the claim for a party for whom an appearance has been entered to deny the authority of attorney and ask relief, is viewed with great disfavor by the courts wherever innocent third persons have acquired rights under the judgment or decree sought to be annulled. And relief will be denied where the fact of the attorney's authority is not fully negatived, but left in doubt under the testimony, and there is no allegation of a meritorious defence to the action." 1 Black, § 374, speaking of proceedings to annul a decree for the want of attorney's authority, says: "The complainant must make it appear that the judgment is inequitable in itself, by reason of some fraud or trick or collusion, or that the result would or might have been different if there had been a full and fair trial upon the merits." I would not like to say that where a clear case of want of authority appears the court would make it a prerequisite to relief that it should appear that no harm was done; but in this particular case I do say that a sale of this property was inevitable for a large volume of debts, and that it could not be avoided, and that it appears that the sales that were made were happy sales for the estate, very advantageous to it, and that such facts must be considered by a court of equity, in connection with other facts, as going to deny relief and as saying equity does not see its way to undo these things.

As stated above, on the faith of these court proceedings persons made purchases and paid large sums of purchase money, and very large sums in improvements, and they clearly occupy the place of purchasers for valuable consideration without notice of any want of authority, and they are protected under that principle which says that against a purchaser for valuable consideration a court of equity will take no step to his harm. "A purchaser for value without notice having obtained a conveyance will not be affected by latent equity, whether by lien, incumbrance, trust, fraud, or any other claim." "From a purchaser for value without notice this court takes nothing away." This rule, everywhere held, is sustained by many authorities cited in *Dunfee* v. *Childs,* 59 W. Va. 226, 248. There is no evidence that these purchasers had any notice of any want of power in these attorneys to consent to these decrees. All the circumstances tend otherwise. It is well

established that a purchaser under decree need not inquire as to the attorney's authority. *Williams* v. *Jones,* 34 Am. St. R. 513; 2 Freeman on Judgments, § § 509, 510; *Low* v. *Settle,* 22 W. Va. 187. -

It seems to be well established that when the relation of client and attorney exists the attorney has power to confess judgment or consent to a decree. 3 Am. & Eng. Ency. L. 368; 4 Cyc. 936.

In addition to what is said above against the overthrow of the decrees I will add another consideration seeming strong to me for the same result. As remarked above the revival of the suits was an act in open court; so the entry of the decrees selling this large area of valuable property. Everybody in the court house would know of it. The sale of large landed estates. We may say that almost everybody in the county would know of it. It would be the common talk of the whole neighborhood, if not the whole county. And here were five or six of these heirs right around the land. It is wholly unreasonable, even preposterous, to say that these heirs did not know of these transactions. Our knowledge of the affairs of men denies this. Here we may fitly apply the usual doctrine of notice. We said in *Lafferty* v. *Lafferty,* 42 W. Va. 792, that "The law is, that, where one has means of knowledge of a fraud or sufficient notice to put him on inquiry, it is enough to count time against him. Where he has means of knowing or ascertaining, where he is put on inquiry, where ordinary prudence for his interest suggests that he inquire, he must do so or else time runs." This doctrine shows that a party must look out for his interests. We there borrowed language from the United States Supreme Court. "The defence of want of knowledge on the part of one charged with laches is one easily made, easy to prove by his own oath, hard to disprove, and hence the tendency of the courts in recent years has been to hold the plaintiff to a rigid compliance with the law which demands, not only that he should have been ignorant of the fraud, but that he should have used reasonable dilligence to have informed himself of all the facts. Especially is this the case where the party complaining is a resident of the neighborhood in which the fraud is alleged to have taken place." We borrowed the further language: "They do not pretend that the facts of the fraud were shrouded in

concealment, but their plea is that they lived in a remote and secluded region, far from means of information, and never heard, *etc.*   *   *   *   Parties cannot thus, by their seclusion from means of information, claim exemption from the laws that control human affairs, and set up a right to open all transactions of the past. The world must move on, and those who claim an interest in persons or things must be charged with a knowledge of their status and condition, and of the vicissitudes to which they are subject." We applied these principles in *Herold* v. *Barlow,* 47 W. Va. 750. They made no protest against it in court nor to Charles F. Teter nor to the purchasers, so far as appears. Besides, they let about two and one half years or three years go by before they brought this suit. Now, if we should say that Charles F. Teter had no authority to act as counsel, then we could support his action upon the doctrine of ratification. Ratification retroacts and is equivalent to original authority conferred upon the agent and validates his act. These heirs were silent, acquiesced, while their brother was making sales and parties were buying these lands by large outlay, and these open proceedings were taking place. We find it written in *Curry* v. *Hale,* 15 W. Va. 867, as follows: "But if the agent exceeds his authority the act may be ratified by the principal; it is not necessary that there should be any positive and direct confirmation.

"Where with a knowledge of the facts the principal acquiesces in the acts of the agent, under such circumstances as would make it his duty to repudiate such acts if he would avoid them, such acquiescence is a confirmation of the acts of the agent.

"It is not necessary that such knowledge shall be shown by positive evidence; it may be deduced, or inferred from the circumstances and facts of the case." Pts. 3, 4, 5 Syl. "While an unauthorized act cannot take effect as the act of the principal unless it be ratified, and hence need not be rescinded, it is evident that his failure to express dissent upon being informed of a transaction may reasonably give ground for inferring assent. If, for example, an agent should make an unauthorized sale of his principal's property, and the principal, after being informed, should remain silent, knowing that the purchaser was dealing with the property as his own, the principal's silence

would speak his assent as clearly as words." Tiffany on Agency, p. 68. *Ruffner* v. *Hewitt*, 7 W. Va. 605. Under the circumstances of this case these parties must have known of these transactions and that Charles F. Teter and purchasers from him under these contracts were relying in good faith upon those proceedings, and we assert that it was the duty of those parties to speak out, and promptly do so. Mere silence does not always create estoppel; but when, as I think is the case in the present instance, the circumstances demand that a party speak out he cannot remain silent. If he does not an estoppel arises. These parties could not lie silent two and one half years or three years before suing. Under the circumstances this is laches also. "Acquiescence in a transaction may bar a party of the relief in a very short period. Where one has knowledge of an act, or it is done with his full approbation, he cannot undo what has been done; and if he stands by and sees another dealing with property in a manner inconsistent with his rights, and makes no objection, he cannot afterwards have relief. Where his silence permitted or encouraged others to part with their money or property, he cannot complain that his interests are affected; his silence is acquiescence, and it estops him." *Despard* v. *Despard*, 53 W. Va. 443, pt. 4. Syl.

There are some other matters presented to us by counsel for appellant. He suggests that in the suits of Woods and Crimm the court committed certain errors, in this, that it was error to decree the sale of the coal to Arnold without having advertised the sale; that it was error not to ascertain liens before sale; that it was error to correct the decree in the Crimm case of the Shettleworth debt; that it was error to transfer the vendor's lien from the Talbott tract to the Zebb's creek tract We need not further explain these irrelevant matters. Now, it is obvious that if there was error in this respect it was the subject of an appeal, and not of a separate suit attacking collaterally for such errors. This is not an appeal. While those decrees stand unreversed we cannot effect them for such errors. The court had jurisdiction in the cases in Joseph Teter's lifetime and against his heirs afterwards, and any mistakes in these respects were mere errors, remediable by appeal. But being consent decrees no appeal would lie and unless you can find

ground for setting them aside in equity there can be no relief for such alleged errors.

Complaint is made on this line. Charles F. Teter in the pressure of debts upon his father paid for his father $5,628. Joseph Teter and Charles F. Teter and W. S. Teter met and W. S. Teter made the calculation and drew a contract which was signed by the father reciting that in consideration of $7,000, of which $5,628 had been paid and the residue was to be paid thereafter, Joseph Teter sold a tract of land containing sixty-five acres, sometimes called seventy acres, to Charles F. Teter. This is proven by the evidence of W. S. Teter, one of the heirs. In the suit of Crimm a commissioner reported this contract, and that all the purchase money had been paid by Charles F. Teter and the court entered a decree that the legal title of this land be and was vested in Charles F. Teter, and that the decree be made a link in the chain of title of said land from Joseph Teter to Charles F. Teter in lieu of a deed, and that the estate of Joseph Teter be released and discharged from the debts which had been paid by Charles F. Teter for him.

In this present suit in the final decree a deed was decreed to be made by the heirs to Charles F. Teter for said land. The bill in this present case set up that contract between Joseph Teter and Charles F. Teter and attacked it and assigned as error the former decree in the Crimm case. Charles F. Teter answered relying upon that contract, and the court made a decree for the deed as stated. Now, in the first place, the decree in the Crimm case adjudicated Charles F. Teter's right to that land. It did not direct a deed, it is true, but it adjudicated the rights of the parties upon that contract and declared that the decree should constitute title in Charles F. Teter as a deed. I do not say that this is a deed, but it settles the rights of the parties and operates to pass title on the principle of *res judicata;* but whether so or not, the later decree for the deed was only in execution of that former decree which was never appealed from, if erroneous. While that former decree stood unreversed, Charles F. Teter had right to the land by its force. If there was error by the former decree in that respect there was no appeal from it. That part of the former decree declaring Charles F. Teter entitled to the land under the contract

with his father as above stated, was not by consent, but an adjudication by the court upon the contract, and the record touching it, including the commissioner's report touching that contract, and the payment of the liens by Charles F. Teter. It does not rest upon a consent by Charles F. Teter. The appellants' counsel says there was no prayer in Teter's answer for a deed. This is a very refined objection in view of the fact that the former decree had settled the right of Charles F. Teter to the land.

It is not inappropriate, when a court of equity is called upon to resurrect and rip up decrees of courts and acts on which property rights rest, to divine the motive. The evidence shows that these heirs approved and were satisfied, gratified, with the sales when made; but when great coal development took place in Barbour county, and there was what may be called a "craze" for coal land, and prices rose, and this land was developed and found rich, the project of recovery of the land or profit in some way begat this suit.

We affirm the decree.

*Affirmed.*