# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 14, 2014          Decided July 11, 2014

No. 13-7004

COMMISSIONS IMPORT EXPORT S.A.,
APPELLANT

v.

REPUBLIC OF THE CONGO AND CAISSE CONGOLAISE
D'AMORTISSEMENT,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00743)

———

*Francis A. Vasquez Jr.* argued the cause for appellant. With him on the briefs was *Jack Landman Goldsmith III.*

*Boaz S. Morag* argued the cause for appellees. With him on the brief were *Michael R. Lazerwitz* and *Jesse D.H. Sherrett.*

Before: ROGERS, BROWN and MILLETT, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Commissions Import Export S.A. ("the Company") prevailed in 2000 in an arbitration in Paris, France against the Republic of the Congo and Caisse Congolaise

d'Amortissement (collectively "the Congo"). For over eight years, the Company sought with little success to collect on the arbitral award pursuant, in part, to an international treaty known as the New York Convention. After obtaining a judgment in 2009 from a court in England enforcing the arbitral award, the Company sued in the United States to enforce the foreign judgment under state law. The district court denied the Company's motion for summary judgment and dismissed the complaint on the ground that the three-year period to confirm a foreign *arbitral award* under Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 207, preempted the longer period to enforce a foreign *money judgment* under the D.C. Uniform Foreign-Country Money Judgments Recognition Act ("D.C. Recognition Act"), D.C. Code § 15-369.

The Company maintains that FAA Chapter 2 and the D.C. Recognition Act are two entirely separate regimes — one a federal scheme for enforcing foreign arbitral awards, the other a state regime for enforcing foreign court judgments — and that the federal regime does not preempt the longer enforcement period in the D.C. regime because the latter poses no obstacle to the accomplishment of the purposes of the former. We invited the United States to participate as amicus because an international treaty is at issue, and the United States agrees with our conclusion that the Company's attempt to enforce the foreign court judgment by a lawful, parallel enforcement scheme does not stand as an obstacle to accomplishment of the purposes of FAA Chapter 2. Accordingly, we reverse the dismissal of the Company's complaint and remand the case for further proceedings.

**I.**

As background to the discussion of preemption, we describe FAA Chapter 2 and the particular circumstances of this

case.

**A.**

Chapter 2 of the FAA implements the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *opened for signature* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, otherwise known as the "New York Convention." *See* 9 U.S.C. §§ 201–208; *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974); *TermoRio S.A. E.S.P. Grp., LLC v. Electranta S.P.*, 487 F.3d 928, 933–34 (D.C. Cir. 2007). The Convention is a multilateral treaty that, with exceptions, obligates participating countries to honor international commercial arbitration agreements and to recognize and enforce arbitral awards rendered pursuant to such agreements. *See* N.Y. Conv'n Arts. I, II, III; *see also* S. EXEC. REP. NO. 10, at 3–4 (1968) (testimony of Amb. Richard D. Kearney, Office of the Legal Adviser, Dep't of State). The United States did not join the New York Convention when it was opened for signature in 1958, but did finally join in 1970 when Congress enacted the Act To Implement the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Pub. L. No. 91-368, 84 Stat. 692 (1970) ("Foreign Arbitral Awards Convention Act"), as Chapter 2 of the FAA.

Chapter 2 provides in 9 U.S.C. § 201 that the Convention "shall be enforced in United States courts in accordance with this chapter," and in section 202 limits the application of the Convention to international commercial disputes. It establishes a federal forum for disputes concerning arbitrations falling under the Convention, *see id.* §§ 203–204, while providing an optional right of removal by defendants for Convention-related disputes pending in a state court, *see id.* § 205. It also provides for a court to compel arbitration and appoint arbitrators. *See id.* § 206. Of significance here, it imposes a time limit for seeking confirmation of an arbitral award. Section 207 provides:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

Finally, Chapter 2 provides that Chapter 1, regarding non-Convention domestic arbitration, has residual application where there is no conflict with Chapter 2 or the New York Convention as ratified. *See id.* § 208.

## B.

In the 1980s, the Company entered into contracts with the Republic of the Congo to perform public works and supply materials. The contracts were financed through supplier credits extended by Caisse Congolaise d'Amortissement ("CCA") that were formalized through promissory notes issued by CCA and guaranteed by the Republic of the Congo. In 1992, the parties signed an agreement for the repayment over ten years in equal, consecutive monthly payments of certain outstanding debts owed to the Company under the contracts. Article 10 provided that any disputes arising from or relating to the agreement would be resolved by final binding arbitration under the Rules of the International Chamber of Commerce ("ICC"). CCA drew up promissory notes endorsed in favor of the Company, and in 1993 the Republic of the Congo issued a series of commitment letters; each commitment letter contained an irrevocable waiver of immunity from legal proceedings or execution and a commitment to submit all disputes to ICC arbitration in Paris, France, governed by French law.

When the Congo failed to pay the promised amounts as they

came due, and did not respond to the Company's formal demand for payment, the Company filed a request in 1998 for arbitration with the International Court of Arbitration of the ICC and the matter was submitted to arbitration. On December 3, 2000, the arbitral tribunal in Paris issued a final award in favor of the Company ("the Award"). The Award included outstanding principal owed under the agreement, interest, penalty interest on various promissory notes, and costs. The Award was summarily confirmed by the Tribunal de Grande Instance of Paris on December 12, 2000, and was upheld on May 23, 2002 by the Court of Appeals of Paris after the Congo appealed to rescind the Award. The Company filed eleven judicial enforcement proceedings to enforce the Award in France, as well as 82 non-judicial bailiff actions.

The Company also obtained judicial recognition of the Award pursuant to the New York Convention in Belgium and Sweden, but obtained no recovery on the amounts owed. On June 17, 2009, the Company initiated proceedings pursuant to the Convention in the Queen's Bench Division of the High Court of Justice, Commercial Court in London, England. The High Court entered an order on July 10, 2009, ruling that the Award was enforceable in the same manner as a judgment under section 101 of the 1996 Arbitration Act of England, and recalculating the amount due to include additional interest and other costs ("the English Judgment"). Under English law, the judgment became final, conclusive, and enforceable on March 2, 2010, and remains enforceable for six years from that date. *See* Declaration of John Arthur Higham, Q.C. ¶¶ 13, 17. The High Court amended the judgment on November 1, 2011 to account for the Company's successful seizure of French Francs in partial satisfaction of the Award.

Shortly before, on September 2, 2011, the Company filed a complaint in the federal court in the Southern District of New

York to recognize and enforce the English Judgment under the New York Uniform Foreign Country Money-Judgments Recognition Act, N.Y. C.P.L.R. Article 53. That court transferred the case to the federal court in the District of Columbia, *see* 9 U.S.C. § 204, and the Company amended and supplemented its complaint to recognize and enforce the English Judgment under the D.C. Recognition Act. The D.C. Recognition Act provides that "[a]n action to recognize a foreign-country judgment" must be commenced before the judgment expires in the rendering country or within 15 years of the judgment's becoming effective in the foreign country, whichever is earlier. D.C. Code § 15-369. "[A] court of the District of Columbia," subject to limited exceptions, "shall recognize a foreign-country judgment" that "[g]rants or denies recovery of a sum of money" and is final, conclusive, and enforceable where rendered. *Id.* §§ 15-363(a)(1)–(2); 15-363(b); 15-364(a).

The district court denied the Company's motion for summary judgment and dismissed the complaint on the ground that the three-year period for confirmation of foreign arbitral awards in 9 U.S.C. § 207 preempted the D.C. statute's longer enforcement period for foreign money judgments, D.C. Code § 15-369. *See Commissions Import Export S.A. v. Republic of Congo*, 916 F. Supp. 2d 48, 55 (D.D.C. 2013). The Company appeals, and this court has jurisdiction in view of the Congo's waiver of any claim of sovereign immunity in the commitment letters that accompanied the promissory notes. *See* 28 U.S.C. § 1605(a)(1). Our review is *de novo. See, e.g., Indep. Bankers Ass'n of Am. v. Farm Credit Admin.*, 164 F.3d 661, 666 (D.C. Cir. 1999); *Waterview Mgmt. Co. v. FDIC*, 105 F.3d 696, 699 (D.C. Cir. 1997).

**II.**

It is "[a] fundamental principle of the Constitution . . . that

Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); U.S. CONST., art. VI, cl. 2. In some cases, preemption occurs because Congress has provided for it expressly; in the face of an express preemption provision, "[t]here is no doubt" that federal law prevails. *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012). But even without an express preemption provision, "[s]tate law must also give way to federal law in at least two other circumstances." *Id.* at 2501. First, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* Second, "state laws are preempted when they conflict with federal law." *Id.*

The Supreme Court has observed in the domestic arbitration context that "[t]he FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." *Volt Info. Sciences, Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ.*, 489 U.S. 468, 477 (1989). Accordingly, as the parties agree, this case is governed by the conflict preemption doctrine set forth in *Hines v. Davidowitz*, 312 U.S. 54 (1941). Pursuant to *Hines*, federal law will preempt state law where "under the circumstances of [a] particular case, [the challenged state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." 312 U.S. at 67. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects[.]" *Crosby*, 530 U.S. at 373; *see also Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Because what "must be implied is of no less force than that which is expressed," *Crosby*, 530 U.S. at 373 (quotation marks and citation omitted), federal law may preempt state law even if the conflict between the two is not facially apparent — as when, for example, the federal and state laws govern different subject matters, *see, e.g., Perez v. Campbell*, 402 U.S. 637 (1971). Furthermore, federal law may

preempt state law even if both pursue the same ends because "a conflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy," *Arizona*, 132 S. Ct. at 2505 (quotation marks, alterations, and citation omitted); *see Crosby*, 530 U.S. at 379. In accord with these general principles, *Hines* preemption analysis entails two steps: first, identifying the purposes of the federal statute; and second, determining what, if any, obstacles are posed by the challenged state law. Traditional preemption principles apply to District of Columbia laws. *See, e.g., Wash. Serv. Contractors Coal. v. Dist. of Columbia*, 54 F.3d 811, 813, 815 (D.C. Cir. 1995).

**A.**

The basic purpose of FAA Chapter 2 was to implement the New York Convention. "The goal of the Convention, and the principal purpose underlying [the United States'] adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk*, 417 U.S. at 520 n.15; *see TermoRio S.A. E.S.P. Grp.*, 487 F.3d at 933–34. In implementing the Convention, Congress addressed what a former chairman of the ICC described as "the needs of international trade for a rapid, simplified, efficient and inexpensive procedure for eliminating disputes and disagreements in business transactions." Robert Briner & Virginia Hamilton, *The History and General Purpose of the Convention, in* ENFORCEMENT OF ARBITRATION AGREEMENTS AND INTERNATIONAL ARBITRAL AWARDS 3, 14 (Emmanuel Gaillard & Domenico Di Pietro eds., 2008) (hereinafter "Briner & Hamilton"). But at the same time, Congress limited the scope of the Convention's application. As the Seventh Circuit explained, "[t]he concern for an unintended effect on domestic laws, which had counseled against the participation of the United States in 1958, was addressed in the implementation."

*Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 577 (7th Cir. 2007). Section 202 limited disputes "falling under the Convention" to commercial relationships involving a foreign party or having a "reasonable relation with one or more foreign states." 9 U.S.C. § 202; *see* S. REP. NO. 91-702, at 6 (1970) (Kearney testimony). So, "although the Convention would displace certain domestic laws, it would do so only in the narrow context of truly international disputes." *Certain Underwriters*, 500 F.3d at 577.

Congress also set a three-year limit for seeking summary confirmation of "an arbitral award falling under the Convention." 9 U.S.C. § 207. To understand the purpose of section 207, "[c]ongressional intent is discerned primarily from the statutory text.*" CTS Corp . v. Waldburger*, No. 13-339, slip op. at 10 (U.S. June 9, 2014); *see N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). The three year limit in section 207 applies specifically to the confirmation of "arbitral award[s] falling under the Convention," and the court must "presume that [the] legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). Neither section 207 nor any other provision of Chapter 2 mentions foreign court judgments. Nor is there a reference to foreign court judgments in FAA Chapter 1, which has residual application. As a matter of textual analysis, the Company persuasively maintains that section 207's "relatively demanding statute of limitations is tied to its relatively generous summary confirmation process," Appellant's Br. 43, and is best read "as evincing an interest in finality in the *specific context* of foreign award enforcement under the streamlined procedures of FAA Chapter 2," Reply Br. 15 (emphasis added).

Section 207 was modeled on a similar provision in FAA Chapter 1, which provides that "any time within one year after the award is made any party to the arbitration *may apply* to the

court so specified for an order confirming the award[.]" 9 U.S.C. § 9 (emphasis added); *see* H.R. REP. NO. 91-1181, at 4 (1970). The sole textual difference between section 9 and section 207 is that the latter gives prevailing parties two additional years in which to seek confirmation "to allow time for . . . initial enforcement efforts outside the United States." S. REP. NO. 91-702, at 8 (1970) (Kearney testimony). The Congo does not dispute the well-established proposition that the permissively worded provision in section 9, which enables but does not require a party to seek award enforcement pursuant to the FAA, is tied exclusively to award enforcement procedures under Chapter 1 and does not preempt longer enforcement periods available under state law. *See Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 590 (2008); *see also Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 159 (2d Cir. 2003); *Kentucky River Mills v. Jackson*, 206 F.2d 111, 120 (6th Cir. 1953). Although the context is different — Chapter 1 concerns domestic arbitration while Chapter 2 concerns international arbitration — the use of identical language in the two provisions suggests, absent contrary indication, that Congress intended them to operate in a similar manner. *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005) (citing *Northcross v. Bd. of Educ. of Memphis City Sch.*, 412 U.S. 427, 428 (1973)). In other words, Chapter 2, like Chapter 1, preserves a prevailing party's option to pursue other enforcement mechanisms if it so chooses.

The New York Convention does not limit the period for enforcement of arbitral awards and includes no restriction regarding foreign judgments. Under Article III of the Convention, signatory countries may apply their own statutory periods for the enforcement of arbitral awards, so long as such periods are not unduly short, or may choose, as many countries have, not to impose any time limit on enforcement. The Convention also expressly preserves, under Article VII, arbitral parties' right to rely upon domestic laws that are *more favorable*

to award enforcement than are the terms of the Convention: "The provisions of the present Convention shall not . . . deprive any interested party of any right he may have to avail himself of an arbitral award in the manner and to the extent allowed by the law . . . of the country where such award is sought to be relied upon." N.Y. Conv'n Art. VII. As one oft-quoted academic-practitioner has written, the underlying rationale of Article VII is that the "Convention is aimed at facilitating recognition and enforcement of foreign arbitral awards; if domestic law or other treaties make recognition and enforcement easier, that regime can be relied upon." Albert Jan van den Berg, *The New York Convention of 1958: An Overview, in* ENFORCEMENT OF ARBITRATION AGREEMENTS AND INTERNATIONAL ARBITRAL AWARDS 39, 66 (Emmanuel Gaillard & Domenico Di Pietro eds., 2008). Article XI presumes that countries with a "federal or non-unitary" structure of government may implement the Convention in a manner that is internally non-uniform. *Id.* Art. XI. Thus, the Convention sets minimum protections for the enforcement of international commercial arbitration awards, but does not limit treaty members from affording more protections than the Convention requires. "The Convention . . . sets a 'floor,' but *not* a 'ceiling,' for enforcement of arbitral awards." Amicus United States Br. 7.

Neither does the legislative history of the Foreign Arbitral Awards Convention Act indicate that Congress intended Chapter 2 of the FAA to govern not only arbitral awards but the recognition of judgments as well. As explained by the State Department's Office of the Legal Adviser to the Senate Foreign Relations Committee, although the general subject of arbitration is within federal jurisdiction if it concerns foreign or interstate commerce, "our purpose in adhering to the [New York] Convention is for the beneficial effects it will produce for the *foreign commerce* of the United States and not to make any changes with respect to matters that are traditionally within the jurisdiction of the 50 States of the Union." *Certain*

*Underwriters*, 500 F.3d at 577 n.6 (quoting S. REP. NO. 91-702, at 6 (1970) (Kearney testimony) (emphasis added)). In response to the Committee Chairman's question, "Does this [New York Convention] seek in any way to extend Federal jurisdiction into areas not now within Federal jurisdiction?" the answer by the State Department was "No." S. EXEC. REP. NO. 10, at 7 (1968) (Kearney testimony). The opposition to signing the Treaty in 1958, because adherence "would entail interference with the laws and judicial procedures of a substantial number of the [domestic] States," W.T.M. BEALE, OFFICIAL REPORT OF THE U.S. DELEGATION TO THE UNITED NATIONS CONFERENCE ON INTERNATIONAL COMMERCIAL ARBITRATION (1958), *reprinted in* 19 AM. REV. INT'L ARB. 91, 115 (2008), was not overcome until the "situation ha[d] changed rather dramatically," S. EXEC. REP. NO. 10, at 6 (1968) (Kearney testimony). Whatever one may take away from the legislative history, it shows that Congress was aware of the long-standing concerns relating to interference with domestic state laws yet gave no clear indication of an intent to bar alternative enforcement schemes.

The text of the Foreign Arbitral Awards Convention Act and the circumstances of its enactment thus weigh in support of concluding that Congress did not intend to speak beyond the recognition and enforcement of arbitral awards. Permitting the Company to have recourse to the D.C. Recognition Act to enforce the English judgment, then, would appear to be consistent with FAA Chapter 2's objectives and to pose no obstacle to the accomplishment of its purpose.

**B.**

The Congo suggests, however, that various obstacles to the fulfillment of FAA Chapter 2's purposes are created if the English Judgment is enforced under the D.C. Recognition Act. It maintains that the three-year period in 9 U.S.C. § 207 embodies purposes of "uniformity" and "finality" that would be frustrated by allowing recourse to the D.C. Recognition Act

after expiration of the three-year period. *See Commissions Import Export S.A.*, 916 F. Supp. 2d at 53, 55. As the Congo sees it, "instead of a single, uniform three-year limitations period, defendants would face a multitude of diverse limitations . . . if litigants could recognize an award in a Convention signatory with no limitations period and then bring that judgment to the United States." Appellees' Br. 44–45 (quotation marks omitted). The Congo maintains that the carefully crafted framework of Chapter 2 of the FAA provides it "a defense to recognition and enforcement of the Award in the United States that may not be overcome by the expedient of [the Company] pursuing under state law the same relief as in an action to enforce the Award itself." *Id.* at 50. But, as shown, neither the text, context, nor legislative history of the Foreign Arbitral Awards Convention Act indicates that Congress intended to promote uniformity and finality in the manner the Congo proposes, *cf. Arizona*, 132 S. Ct. at 2504–05.

Even assuming 9 U.S.C. § 207 may "promote finality, repose, and the efficient and prompt administration of justice," Appellee's Br. 33 (citation omitted); *see Commissions Import Export S.A.*, 916 F. Supp. 2d at 54, 55, such an assumption implies little about the intended *scope* of the provision. Because international arbitration is undoubtedly within the United States' federal legislative power, the fact that Congress acted at the federal level to carry out its obligations under the New York Convention does not, as the Congo suggests, indicate a particular preference for national uniformity in this area. *See* N.Y. Conv'n Art. XI. Indeed, the fact that section 205 provides for *permissive* removal from state proceedings, 9 U.S.C. § 205, further bolsters the conclusion that uniformity was not Congress's exclusive concern in enacting section 207.

"The States' coordinate role in government counsels against reading federal laws to restrict States' sovereign capacity to regulate in areas of traditional state concern." *CTS Corp.*, No.

13-339, slip op. at 10 (U.S. June 9, 2014) (quoting *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. —, 133 S. Ct. 1003, 1016 (2013) (internal quotation marks and ellipsis omitted)). State courts have long recognized the conceptual difference between arbitral awards and foreign court judgments on arbitral awards, *compare Gilbert v. Burnstine*, 174 N.E. 706, 707 (N.Y. 1931), *with Skandinaviska Granit Aktiebolaget v. Weiss*, 234 N.Y.S. 202, 204–08 (N.Y. App. Div. 1929), and treated foreign court judgments on awards as enforceable under state law, *see Wright, Graham & Co. v. Hammond*, 154 S.E. 649, 650 (Ga. Ct. App. 1930); *Skandinaviska Granit Aktiebolaget*, 234 N.Y.S. at 204–08.  Although an arbitral award and a court judgment enforcing an award are "closely related," Appellees' Br. at 34, they are nonetheless "distinct" from one another, Amicus United States Br. 14, and that distinction has long been recognized, *see* Briner & Hamilton at 6 (quoting ICC Council Res. (Nov. 6, 1925)).  The United States accordingly emphasizes:

> It is essential to recognize that a foreign court judgment confirming an arbitral award is not governed by the New York Convention or the Foreign Arbitral Awards Convention Act.  As a matter of U.S. law, the mechanism for obtaining recognition and enforcement of a foreign money judgment arising out of an arbitral award has been understood to be distinct from an action seeking recognition and enforcement of an arbitral award.  *See, e.g., Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 582-583 (2d Cir. 1993).  Enforcement of a foreign court money judgment has traditionally been governed by state law.  *See* Restatement (Third) of Foreign Relations Law of the United States § 481 comment a (1987); *see also* Nat'l Conf. of Commissioners on  Uniform State Laws, Uniform Foreign Country Money Judgments Recognition Acts

(1962 & 2005).

Amicus United States Br. 14. The distinction between awards and judgments is amplified here by the fact that the English Judgment includes interest that the Company could not have collected had its prior efforts to collect on the Award under the Convention been successful.

As noted, the overriding purpose of FAA Chapter 2 is to facilitate international commercial arbitration by ensuring that valid arbitration agreements are honored and valid arbitral awards are enforced. *See Scherk*, 417 U.S. at 520 n.15. The "amendment of the Federal Arbitration Act" to include Chapter 2 reflects a congressional judgment that the "emphatic federal policy in favor of arbitral dispute resolution . . . applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985); *see also BG Group, PLC v. Republic of Argentina*, 134 S. Ct. 1198 (2014). That policy is not undermined — and frequently will be advanced — through recourse to parallel enforcement mechanisms that exist independently of the FAA. *See* Amicus United States Br. 16 (quoting RESTATEMENT (THIRD) OF U.S. LAW OF INTERNATIONAL COMMERCIAL ARBITRATION, § 4-3(d), Reporter's Notes g, Tentative Draft No. 2 (Apr. 16, 2012)); *cf. Hall St. Assocs.*, 552 U.S. at 590. Of course, the Congo is correct that merely sharing the same "overarching objectives," Appellees' Br. 51, as federal law will not necessarily save a state law from preemption if its methods of achieving those objectives conflict with federal law. For instance, in *Arizona* the Supreme Court held the state statute was preempted to the extent that it imposed criminal penalties contrary to Congress's "comprehensive framework for 'combating the employment of illegal aliens'" where the legislative history indicated that Congress had "made a deliberate choice not to impose criminal penalties on aliens who seek . . . unauthorized employment." 132 S. Ct. at 2504

(internal citation omitted); *see Crosby*, 530 U.S. at 378–80. No such statutory intent or legislative history exists for FAA Chapter 2 regarding the enforcement of foreign judgments. To the extent the Congo relies on *Volt Information Sciences*, 489 U.S. at 478–79, involving a domestic arbitration agreement, to support its contention that application of the D.C. Recognition Act is contrary to the parties' agreement French law would apply to their arbitration, the choice of French law has no bearing on subsequent proceedings to enforce an arbitral award under the New York Convention.

The Congo's remaining points are likewise unpersuasive. Permitting recourse to the D.C. Recognition Act would, the Congo maintains, "attach[] a significance to the English Judgment that is directly at odds with the FAA's and the Convention's 'carefully crafted framework for the enforcement of international arbitration awards.'" Appellees' Br. 35 (quoting *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 729 (D.C. Cir. 2012) (quoting *TermoRio S.A. E.S.P. Grp.*, 487 F.3d at 935)). The Congo emphasizes that England is a "secondary jurisdiction" with respect to the French arbitral award, and that "court proceedings in another secondary jurisdiction have 'no preclusive effect' in recognition proceedings in the United States." *Id.* at 36 (quoting *Belize Soc. Dev. Ltd.*, 668 F.3d at 730); *see also Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 308–10 (5th Cir. 2004). The Company acknowledges, however, that its cause of action under the D.C. Recognition Act "does not call for the [d]istrict [c]ourt automatically to accord preclusive effect to the English Court's determinations on the Award under the Convention, but rather to assess the English Judgment under the separate (and clearly distinct) factors for judgment recognition under District of Columbia law." Reply Br. 21–22. The Congo's contentions regarding the "limited territorial effect" of the English Judgment and U.S. courts' historical reluctance to recognize "judgments on judgments," Appellees'

Br. 36–37, 46, seem to present public policy arguments better suited, at best, *see* Amicus U.S. Brief at 17 (citing Nat'l Conf. of Comm'rs on Uniform State Laws, Uniform Foreign Country Money Judgments Recognitions Act, § 4 cmt. (2005)), as arguments to a court applying the D.C. Recognition Act than as arguments for preemption.

The Congo further maintains that preemption of the D.C. Recognition Act is supported by "a series of Supreme Court decisions . . . preclud[ing] suits under state law that would effectively deprive a defendant of a defense to liability, or deny a benefit, afforded by a federal scheme." Appellees' Br. 47–48. Yet those cases are of limited assistance because "the ultimate touchstone in every pre-emption case" is necessarily "the purpose of Congress." *Wyeth*, 555 U.S. at 565. Determining whether Congress intended a particular federal defense or limitation to be available notwithstanding state law is a statute-specific inquiry. There is no indication of such broad intent here; thus, generalized comparisons to other cases applying unrelated statutes are readily distinguishable. In any event, the court is not presented with a case in which defenses under the New York Convention were denied; the Congo invoked its Convention defenses when it appealed, albeit unsuccessfully, in the Paris Court of Appeals to rescind the Award for alleged non-compliance with the adversary principle and international public order on recognition and enforcement because the arbitrators allegedly relied on forgeries or documents obtained by fraudulent means; the French court rejected the Congo's Convention defenses.

## C.

As the Supreme Court recently reemphasized, it is a "well-established principle that it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Bond v. United States*, 134 S. Ct. 2007, 2089 (2014)

(quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). Against the historical backdrop of state law on the enforcement of foreign judgments, it is unlikely that Congress would have intended its implementation of the New York Convention to cover both arbitral awards and judgments without mentioning the latter in FAA Chapter 2.  Congress's "silence on the issue [of preemption], coupled with its certain awareness of the prevalence of state [foreign money judgment enforcement statutes], is powerful evidence that Congress did not intend [FAA Chapter 2] to be the exclusive means of ensuring" arbitration agreements and arbitral awards are enforced.  *Wyeth*, 555 U.S. at 575 (citing *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–67 (1989)).  An alternative conclusion could frustrate the collection of debts determined pursuant to the parties' voluntary arbitration agreement, and it seems unlikely this was Congress's intent.  The Company pursued the enforcement remedy available under the Convention, yet the debt remains unsatisfied.  Its use of a lawful parallel enforcement scheme does not present an obstacle to the summary process Congress adopted in implementing the Convention.  *Cf. POM Wonderful LLC v. Coca-Cola Co.*, No. 12-761, slip op. at 11 (U.S. June 12, 2014).

Our conclusion that FAA Chapter 2 does not preempt enforcement of the English Judgment accords with the longstanding position of the Second Circuit Court of Appeals, the only other federal appeals court to have addressed the relationship between 9 U.S.C. § 207 and state judgment recognition laws.  Shortly after the Foreign Arbitral Award Convention Act was enacted, in *Island Territory of Curacao v. Solitron Devices, Inc.*, 489 F.2d 1313 (2d Cir. 1973), the Second Circuit held that both the New York Convention and FAA Chapter 2 "go only to the enforcement of a foreign arbitral award and not to the enforcement of foreign judgments confirming foreign arbitral awards," *id*. at 1319. Subsequently, in *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH &*

*Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 29 F.3d 79 (2d Cir. 1994) ("*Seetransport II*"), the Second Circuit permitted the enforcement under the New York Uniform Foreign Money-Judgments Recognition Act of a judgment of the Paris Court of Appeals awarding the sums in an arbitral award where, as here, the period for seeking confirmation of the award under the FAA Chapter 2 had passed. The court had explained: "[U]nlike the recognition of arbitral awards, which is governed by federal law, the recognition of foreign judgments is governed by state law." *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 582 (2d Cir. 1993) ("*Seetransport I*") (citing REST. (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 481 cmt. a (1987)). The Congo's attempts to distinguish these cases are unpersuasive. For instance, the Congo insists that *Seetransport II* "simply did not address the preemption issue," Appellees' Br. 53, but that was because the preemption issue had been resolved in *Solitron Devices, Inc.*, 489 F.2d at 1319, and the court had reaffirmed its position, *see Victrix Steamship Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 n.2 (2d Cir. 1987); *Waterside Ocean Navigation Co., Inc. v. Int'l Navigation Ltd.*, 737 F.2d 150, 154 (2d Cir. 1984); *Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512, 518 (2d Cir. 1975). As the relevant facts here are virtually identical to those in *Seetransport*, the reasoning of the Second Circuit is instructive.

Our conclusion is also consistent with the presumption against preemption, which demands that "in all pre-emption cases, and particularly those in which Congress has legislated in a field which the States have traditionally occupied" without enacting an express preemption provision, the court must assume "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565 (alterations and quotation marks omitted); *cf. Bond*, 134 S. Ct.

at 2089.  As discussed, "the enforcement of foreign judgments was, and remains, presumptively and primarily under the control of the states."  Reply Br. 24; *see* RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 481 cmt. a (1987); *see also Aetna Life Ins. Co. v. Tremblay*, 223 U.S. 185, 190 (1912); *Johnston v. Compagnie Generale Transatlantique*, 152 N.E. 121, 123 (N.Y. 1926).  Because "Congress does not cavalierly pre-empt state-law causes of action," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), the absence of a "clear and manifest" preemptive purpose in FAA Chapter 2 reinforces the conclusion that preemption is not warranted here.

Accordingly, we hold that the limitations period in FAA Chapter 2, 9 U.S.C. § 207, does not preempt the longer limitations period in the D.C. Recognition Act for enforcing a foreign court judgment, D.C. Code § 15-369, and we reverse the dismissal of the Company's complaint.  We remand the case for the district court to determine whether the English Judgment is enforceable under the D.C. Recognition Act.  This court has no occasion today to decide whether 9 U.S.C. § 207 preempts longer State statutes of limitations related to State enforcement of foreign arbitration awards.