# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 22, 2024               Decided July 30, 2024

No. 23-7023

DORALEH CONTAINER TERMINAL SA,
APPELLEE

v.

REPUBLIC OF DJIBOUTI,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-02571)

———

*Matthew M. Madden* argued the cause for appellant. With him on the briefs was *Jason A. Shaffer*.

*Dennis H. Hranitzky* argued the cause for appellee. With him on the brief were *Debra O'Gorman* and *Alexander H. Loomis*.

Before: RAO and CHILDS, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

2

Dissenting opinion filed by *Senior Circuit Judge* ROGERS.

RAO, *Circuit Judge*: When counsel appears for a party, we presume the lawyer was authorized to do so. This case presents the unusual situation in which a lawyer's authority to represent his purported client has been challenged.

In a long running dispute between the Republic of Djibouti and Doraleh Container Terminal ("Doraleh"), Doraleh obtained a $474 million arbitral award against Djibouti. Djibouti then nationalized a majority interest in Doraleh, and a Djiboutian court appointed a provisional administrator to manage the company. Purporting to represent Doraleh, the law firm Quinn Emanuel sought to enforce the arbitral award in district court. But the administrator said she did not authorize the filing, and Djibouti asked the district court to dismiss the case. The district court entered judgment for Doraleh, holding that Quinn Emanuel's authority was irrelevant or, in the alternative, that Djibouti had forfeited the issue.

We disagree. Applying longstanding legal principles, we hold that Quinn Emanuel's authority is relevant and that the issue of a lawyer's authority can be challenged at any point in litigation. Because Djibouti presented evidence raising substantial questions about Quinn Emanuel's authority, the court was required to determine whether the law firm had authority to file this suit. We therefore vacate the judgment and remand for the district court to determine Quinn Emanuel's authority to represent Doraleh.

I.

A.

This dispute concerns a public-private partnership in which Djibouti contracted with Doraleh to build and manage a

new port for container ships. Two-thirds of Doraleh, a Djiboutian corporation, was owned by Port de Djibouti SA, a government affiliated corporation. DP World, a Dubai corporation with expertise in port construction and management, owned the other one-third but was given the right to control Doraleh.

The port was a financial success—perhaps too much of a success. Disputes over control spawned arbitral challenges and litigation in Djibouti and England. Despite an exclusivity provision in its contract with Doraleh, Djibouti built a competing port. Djibouti then tried to force Doraleh out of the original port. Djibouti initiated arbitration in the London Court of International Arbitration to void the contract, claiming it was the product of bribery and corruption. When that failed, Djibouti enacted a law authorizing it to renegotiate or terminate Doraleh's contract. After Doraleh refused to negotiate, Djibouti terminated the contract and seized the original port. Doraleh convened a second arbitral panel, which held the contract termination was invalid and Doraleh's contract to manage the port remained binding.

In light of its arbitral loss, Djibouti switched course. Instead of trying to terminate Doraleh's contract, Djibouti sought to take control of the company. A presidential ordinance, later ratified by statute, nationalized Port de Djibouti's two-thirds ownership interest in Doraleh. Djibouti then sued in its own courts, and, as the new majority shareholder of Doraleh, claimed DP World was abusing its control rights. The Djiboutian court agreed and appointed a provisional administrator, Chantal Tadoral, ostensibly independent of either shareholder, to manage Doraleh in place of the board of directors controlled by DP World.

4

Despite these setbacks, Doraleh and DP World secured one notable victory. When Djibouti initiated the first arbitration to void the contract, Doraleh and DP World counterclaimed for breach of contract. Quinn Emanuel represented both corporations.[1] Djibouti did not participate in the counterclaim proceedings. The arbitral panel began considering the breach of contract claims shortly before Djibouti's nationalization of Port de Djibouti's stake in Doraleh and Tadoral's appointment. Tadoral notified the panel that Quinn Emanuel lacked authority to continue representing Doraleh in the arbitration and, purporting to act on behalf of Doraleh, asked for a stay of the proceedings. Quinn Emanuel disputed the validity of Tadoral's appointment. Denying the stay request, the tribunal declined to determine Tadoral's authority because it was not relevant to the merits and the authority dispute arose after any further participation was needed from either party. The tribunal awarded Doraleh $474 million, plus interest, for Djibouti's contract breaches.[2] Tadoral, Doraleh's provisional administrator, has taken no steps to enforce the award against Djibouti.

---

[1] Doraleh executed a 2014 power of attorney authorizing Quinn Emanuel to represent it in the arbitration and "any other related matters." After Djibouti raised doubts about whether the counterclaims had been properly authorized, Doraleh's Board of Directors, "for the avoidance of doubt," ratified Quinn Emanuel's engagement in a 2016 resolution.

[2] The arbitral panel also awarded DP World $148 million, plus interest, based on its separate counterclaims. DP World enforced that award in a separate proceeding. Judgment, *DP World Djib. FZCO v. Republic of Djibouti*, No. 1:23-cv-01524 (D.D.C. July 24, 2024). Quinn Emanuel also represented DP World in that proceeding.

5

B.

Quinn Emanuel, claiming to represent Doraleh, petitioned to enforce the arbitral award in the District Court for the District of Columbia. Djibouti asserted an affirmative defense that the "attorneys who filed [the petition] … lack the authority to do so." This lack of authority, Djibouti argued, created several problems. If Doraleh had not authorized the filing, no petition to enforce the award was made by a "party to the arbitration," as required by law. *See* 9 U.S.C. § 207. And there would be no Article III case or controversy between adverse parties. Djibouti maintained that because it had raised a dispute about Quinn Emanuel's authority, the court was required to verify that Doraleh had authorized the petition to enforce the arbitral award.

Djibouti moved to compel discovery on Quinn Emanuel's authority to act for Doraleh, attaching a declaration by Tadoral that she had not authorized the petition. Quinn Emanuel opposed discovery, arguing its authority had "no bearing" on whether to enforce the arbitral award. The district court denied the motion to compel discovery, concluding Djibouti forfeited any objection to Quinn Emanuel's authority to file the enforcement petition by not raising a challenge to the firm's authority in arbitration.

Djibouti later filed a second declaration from Tadoral requesting the case "be dismissed without prejudice as having been filed and prosecuted in [Doraleh's] name without authority" and expressly revoking any remaining authority Quinn Emanuel had to represent Doraleh.

The district court entered judgment for Doraleh and confirmed the arbitral award. *Doraleh Container Terminal SA v. Republic of Djibouti*, 656 F. Supp. 3d 223, 236 (D.D.C. 2023). It rejected Djibouti's authority argument on two

alternative grounds. First, the court held that Djibouti forfeited the authority argument, which was a "challenge [to] the award on grounds that could have been brought before the arbitrator" but were not. *Id.* at 233. Second, the court held that Quinn Emanuel's authority was irrelevant because the statute implementing the New York Arbitration Convention limits the reasons to refuse enforcement of arbitral awards to those listed in the Convention, and lack of attorney authority is not a listed reason. *Id.* at 233–34.

Djibouti appealed, arguing the district court erred by entering judgment without determining whether Doraleh authorized Quinn Emanuel to file this petition to enforce the arbitral award.

## II.

Challenges to an attorney's authority to represent a party rarely arise in modern litigation, but the governing principles are well established in Supreme Court decisions and a traditional understanding of our adversarial judicial system.

An attorney's authority to represent his client "must indeed exist." *Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738, 830 (1824). Such authority is presumed, *Hill v. Mendenhall*, 88 U.S. (21 Wall.) 453, 454 (1874), and the presumption is rarely challenged.[3] But courts have the "power,

---

[3] Perhaps because of how rare attorney authority challenges are, the Federal Rules of Civil Procedure do not address them. Rule 9 includes procedures for challenging "a party's authority to sue or be sued in a representative capacity." FED. R. CIV. P. 9(a)(1)(B). Rule 9 procedures, however, do not apply to disputes about whether the lawyer has authority to represent the named party. They apply instead to situations in which the named party represents a separate

at any stage of the case, to require an attorney, one of its officers, to show his authority to appear." *Pueblo of Santa Rosa v. Fall*, 273 U.S. 315, 319 (1927). This stems from a court's "duty … to superintend the conduct of its officers." *Id.* Federal courts have recognized this basic principle for more than two hundred years. As Justice Washington explained, it is an "absolute" rule that the court has "the power to inquire by what authority an attorney" undertakes a representation. *The King of Spain v. Oliver*, 14 F. Cas. 577, 578 (C.C.D. Pa. 1810) (No. 7,814). This court has similarly recognized our "undoubted power to require counsel before us to demonstrate their authority." *Donnelly v. Parker*, 486 F.2d 402, 405 n.6 (D.C. Cir. 1973); *see also McLean v. Burkinshaw*, 107 F.2d 665, 665–66 (D.C. Cir. 1939) (per curiam) (recognizing district court's authority to do the same); *Booth v. Fletcher*, 101 F.2d 676, 683 (D.C. Cir. 1938).

When a party requests the court inquire into the lawyer's authority and presents evidence showing "sufficient ground to question the authority," the request is "always granted."[4] *W.A. Gage & Co. v. Bell*, 124 F. 371, 380 (W.D. Tenn. 1903); *see McKiernan v. Patrick*, 5 Miss. (4 Howard) 333, 335 (1840) ("[W]here it is shown to the court that injury or oppression is happening, or is likely to happen, the court will interpose, and require an attorney to show his authority."). A court need not consider "light or frivolous grounds" for a challenge to an attorney's authority but must evaluate "substantial reasons."

---

entity, such as when executors and guardians sue in their own names. *See* FED. R. CIV. P. 17(a), (c).

[4] Courts may consider context when determining whether sufficient grounds for questioning authority have been presented. But contrary to the dissent's suggestion, courts do not have discretion to refuse to require an attorney to show his authority when such grounds are present.

*Tally v. Reynolds*, 1 Ark. 99, 104 (1838). This has long been the "settled rule" in "most, if not all" states as well as the "courts of England." *Id.* The court has "discretion" "as to the time and manner of calling for" the lawyer's authority.[5] *Pueblo of Santa Rosa*, 273 U.S. at 319 (cleaned up).

As for the remedy, "[a] suit initiated without authority from the party named as plaintiff is a nullity and any judgment obtained in such a suit is void." *Meredith v. The Ionian Trader*, 279 F.2d 471, 473–74 (2d Cir. 1960). If the court finds the plaintiff's counsel lacked authority to bring the suit, the suit must be dismissed "without prejudice."[6] *Pueblo of Santa Rosa*, 273 U.S. at 321; *see also Frye v. County of Calhoun*, 14 Ill. 132, 134 (1852) (holding that when a plaintiff's attorney fails to show his authority, the case "should be summarily dismissed").

Djibouti argued before the district court that Quinn Emanuel lacked authority to represent Doraleh and provided declarations from Tadoral, the Djiboutian-court-appointed

---

[5] Contrary to the dissent's suggestion, our review is not limited to the traditional abuse of discretion standard. The cases make clear that the power to inquire into an attorney's authority is possessed concurrently by appellate courts. *See Pueblo of Santa Rosa*, 273 U.S. at 319. Unlike matters committed to the district court's exclusive discretion, we have the power and duty to look into an attorney's authority, or direct the district court to look into it, regardless of how the district court exercised its discretion in the first instance.

[6] While some cases recognize a court's discretion as to the remedy, in practice, when a court determines the plaintiff's attorney lacks authority, the suit is dismissed. *See Pueblo of Santa Rosa*, 273 U.S. at 319, 321 (quoting language from *The King of Spain*, 14 F. Cas. at 578, that the remedy is "in the discretion of the Court" before ordering the case remanded with instructions to dismiss without prejudice).

provisional administrator, stating that she did not authorize this suit. The district court erroneously concluded it could not address the merits of these authority arguments. Tadoral's declarations set forth the type of substantial reasons that create "sufficient ground to question the authority." *W.A. Gage & Co.*, 124 F. at 380. We therefore agree with Djibouti that the district court should have determined Quinn Emanuel's authority to represent Doraleh.

## III.

Echoing the district court, Quinn Emanuel offers two reasons we cannot consider its authority despite this long-standing procedural rule, but neither can be squared with the longstanding principles reflected in our caselaw.

## A.

First, Quinn Emanuel argues Djibouti forfeited any challenge to the firm's authority by not raising it during arbitration. Challenges to a lawyer's authority, however, are not subject to the standard forfeiture rules and may be raised "at any stage of the case," including on appeal. *Pueblo of Santa Rosa*, 273 U.S. at 319. Even under the forfeiture rules that generally govern arbitration, there was no forfeiture here.

## 1.

"Whether, as a matter of practice, the challenge to the authority of counsel" was forfeited—or, as the Court more colorfully put it, "was seasonably interposed"—"is not important to decide." *Id.* "[T]he objection" to an attorney's authority, "is good at any time." *Sutherland v. Int'l Ins. Co. of N.Y.*, 43 F.2d 969, 972 (2d Cir. 1930) (L. Hand, J.). As the cases recognize, the absence of attorney authority would jeopardize the fairness of judicial proceedings in ways that warrant

departing from the traditional forfeiture rules. Courts must prevent the judicial process from being "used for the purpose of vexation or fraud." *Pueblo of Santa Rosa*, 273 U.S. at 319 (quoting *The King of Spain*, 14 F. Cas. at 578). Moreover, dismissing cases brought without authorization prevents the problems caused after those cases reach judgment. Most courts do not give these judgments their full effect. They are often void or voidable, *see, e.g.*, *Shelton v. Tiffin*, 47 U.S. (6 How.) 163, 186 (1848), or lack preclusive effect, *see, e.g.*, 18A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4449 & n.3 (3d ed. 2017). Because of this, the plaintiff could "play fast and loose with the defendant, holding him to the judgment if [the plaintiff] wins, and repudiating it, if [the plaintiff] loses."[7] *Sutherland*, 43 F.2d at 971.

Authority challenges also protect rights of parties not before the court. In this case, *if* Tadoral lawfully controls Doraleh, she and Doraleh have a significant interest in the case being dismissed. If Djibouti's inaction could forfeit authority

---

[7] While a challenge to attorney authority can be raised later in litigation, parties have incentives to raise it promptly. Inaction by the purported plaintiff who becomes aware of the case risks creating apparent authority or ratifying actions taken without authority. *See, e.g.*, *Bacon v. Mitchell*, 106 N.W. 129, 130 (N.D. 1905); *Cyphert v. McClune*, 22 Pa. 195, 197–98 (1853); *Teter v. Irwin*, 71 S.E. 115, 119 (W. Va. 1911); *see also* RESTATEMENT (THIRD) OF AGENCY §§ 2.03, 4.01 (AM. L. INST. 2006) (defining apparent authority and ratification); WRIGHT & MILLER, *supra*, § 4449 ("Unauthorized commencement of an action by another ordinarily should not make the named plaintiff a party, unless the named plaintiff has himself done something that makes it reasonable for an adversary to believe the action is authorized."). No such inaction is present here because Djibouti promptly filed Tadoral's declaration alleging that Quinn Emanuel lacked authority.

challenges, that forfeiture would impair Tadoral's and Doraleh's rights.

We need not close our eyes to the apparent relationship here between Tadoral and Djibouti. Quinn Emanuel, for example, has alleged that Tadoral is "an agent or instrumentality of" Djibouti and that she has "a direct conflict of interest" with Doraleh. Even if such a relationship exists, however, it does not undermine the general rule that a defendant's failure to timely raise an authority issue does not forfeit a potentially unrepresented plaintiff's rights.

Because authority challenges vindicate important interests of parties and non-parties and protect the integrity of judicial proceedings, Djibouti's failure to raise an authority challenge during arbitration does not prevent a federal court from considering Quinn Emanuel's authority to file this petition.

2.

Moreover, even under the forfeiture rules that generally govern arbitration, Djibouti did not forfeit its authority challenge.

In general, a party who does not raise defenses that would have applied during arbitration forfeits those defenses. *See, e.g.*, *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir. 1998). This enforcement lawsuit, however, does not implicate that rule. Djibouti could not have challenged Quinn Emanuel's authority as a defense during arbitration. As Quinn Emanuel explained, the authority dispute was "irrelevant" to the merits of the arbitration. And importantly, Tadoral did not purport to terminate Quinn Emanuel's authority to represent Doraleh until after the firm's work on the merits of the arbitration was complete. So the arguments for

why Quinn Emanuel lacks authority in this court are based on different facts than those present during the arbitration.

The dissent's forfeiture argument rests primarily on the fact that the arbitral panel asked the parties about the validity of Tadoral's appointment. But the panel asked only for the narrow purpose of deciding Tadoral's last minute request to stay the arbitration. Quinn Emanuel convinced the arbitral panel to deny the stay without deciding the authority issue because, regardless of who controlled Doraleh, the stay request came too late. Finding a forfeiture here would allow Quinn Emanuel to argue an issue is unnecessary to decide in arbitration and then turn around and argue to the district court that Djibouti forfeited a defense on the same issue. Quinn Emanuel cannot have it both ways.

Finally, the authority issue was raised and fully briefed during arbitration by Quinn Emanuel and Tadoral—the parties most affected by the dispute. The arbitral panel acknowledged "the powerful points to be made on both sides," but then declined to address the validity of Tadoral's appointment because it was irrelevant to the merits issues. It is unclear why Djibouti needed to separately press the issue. In these circumstances, we decline to find Djibouti forfeited the challenge to Quinn Emanuel's authority.[8]

---

[8] At bottom, our disagreement with the dissent is rather narrow. We conclude the arbitral panel did not decide the authority issue Tadoral raised because Quinn Emanuel's loss of authority—if it lost authority—came too late to affect the arbitration. And the dissent fails to explain what unauthorized acts Djibouti could have objected to when Tadoral revoked Quinn Emanuel's authority only after no further action by the firm was needed.

13

B.

Quinn Emanuel also argues that its authority cannot be considered because attorney authority is not one of the reasons listed in the New York Convention for denying enforcement of an arbitral award. *See* 9 U.S.C. § 207; Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention") art. V, June 10, 1958, 330 U.N.T.S. 3, 40.

While it is true that attorney authority does not explicitly appear as a ground for denying enforcement, it remains a basic principle that filings made by attorneys without the party's consent are a "nullity." *The Ionian Trader*, 279 F.2d at 473. This conforms with the rule that "[a]n unauthorized appearance is generally ineffectual for any purpose." 6 C.J.S. *Appearances* § 19 (2023) (collecting cases). If Doraleh did not authorize this petition, then there is no petition on which to grant or deny enforcement of the arbitral award.

The New York Convention does not abrogate this procedural rule. The Convention requires signatory countries to "recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon." New York Convention, *supra*, art. III, 330 U.N.T.S. at 40. The implementing statute applies the Federal Arbitration Act's procedures to petitions to enforce arbitral awards under the Convention. *See* 9 U.S.C. § 208 (applying the Federal Arbitration Act to § 207 petitions when they are not in conflict). The Federal Arbitration Act provides that petitions for enforcement "shall be made and heard in the manner provided by law for the making and hearing of motions." *Id.* § 6. The Supreme Court has recently reiterated that this "directive … is simply a command to apply the usual

federal procedural rules." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1714 (2022).

Applying usual procedural rules makes good sense. If lack of attorney authority is not a ground for denying enforcement, as the dissent maintains, a court would need to enforce an arbitral award even when a stranger to the arbitration files a § 207 petition in the name of an award recipient. Such an approach is untenable and inconsistent with longstanding precedent. Instead, Djibouti's challenge to Quinn Emanuel's authority must be governed by the usual rules of federal court procedure.

\* \* \*

When presented with Tadoral's declarations, the district court had an obligation to determine whether Doraleh authorized Quinn Emanuel to file this petition.

IV.

Quinn Emanuel asks this court to reach the question of authority and affirm because the firm was authorized to represent Doraleh. Given the limited briefing on the complicated issues involved, we remand for the district court to determine Quinn Emanuel's authority in the first instance. *See Donnelly*, 486 F.2d at 405 n.6. While leaving that factual question to the district court, "we can provide some guidance for the task to be tackled on remand." *Affum v. United States*, 566 F.3d 1150, 1159 (D.C. Cir. 2009) (cleaned up).

An attorney's authority generally depends on traditional agency law concepts such as actual authority, apparent authority, and ratification. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS §§ 26–27 (AM. L. INST. 2000). The dispute in this case is about actual authority. The scope of an

attorney's actual authority usually depends on the contract between the lawyer and client and any instructions from the client. *Id.* § 21. Subject to exceptions requiring notice to and permission from tribunals in pending matters, a client can revoke his lawyer's authority. *Id.* §§ 31–32.

Quinn Emanuel claims Doraleh's 2014 power of attorney and 2016 board resolution authorized the filing of this petition in 2020. Quinn Emanuel also maintains that it needed no further authorization from Doraleh. The district court should assess both of these arguments in the first instance.

Djibouti argues that even if the written authorizations would have sufficed, Tadoral has since revoked the firm's authority. Quinn Emanuel counters that Tadoral lacked authority to do so. To determine the validity of this revocation or any other instructions Tadoral has given to Quinn Emanuel, the district court will need to resolve whether Tadoral had authority to act on Doraleh's behalf.

At the outset, the district court should accept any motions to compel arbitration—either about Quinn Emanuel's authority to represent Doraleh or, more narrowly, about Tadoral's authority to act on behalf of Doraleh. Quinn Emanuel points to several contracts with arbitration clauses, including Doraleh's Articles of Incorporation and the Joint Venture Agreement. The Djiboutian court order appointing Tadoral, however, determined the Articles of Incorporation's arbitration clause did not apply. Doc. 37-5 at 6. If a party moves to compel arbitration, the district court should decide what country's law governs the applicable arbitration clause; what effect, if any, to give to previous decisions interpreting the clause; and what issues are subject to arbitration.

If no motion to compel arbitration is filed or the motion is denied, the district court should determine Quinn Emanuel's

authority. In addition to any other issues briefed by the parties or raised by the district court, the following questions may be relevant to the question of authority.

First, does a choice of law provision apply? At oral argument, Quinn Emanuel said the parties "plainly chose" to be "governed by English law to resolve any questions arising from disputes, management disputes, among the parties." Oral Arg. at 26:00–26:20. But when the arbitral panel asked "whether there is any ground upon which the tribunal could refuse to apply Djibouti[an] law as to the validity of [Tadoral's] appointment," Quinn Emanuel did not invoke such a provision. *See* Doc. 39-15 at 2; Doc. 39-17 at 6–7. For the narrow issue of what actions were authorized by the 2014 power of attorney, that contract "is governed by English law." Doc. 37-3 at 1.

Second, does it matter if, as Quinn Emanuel claims on appeal, "a [United Kingdom] court enjoined Djibouti from commencing its Djibouti[an] proceedings to appoint" Tadoral? This injunction is not part of the record. On remand, the district court should consider whether Tadoral's appointment violates the 2018 injunction, and, if so, the consequences for Quinn Emanuel's authority.

Third, does the internal affairs doctrine apply? The "management of the internal affairs of a corporation" is generally left to the place of incorporation. *See, e.g.*, *Rogers v. Guar. Tr. Co. of N.Y.*, 288 U.S. 123, 130 (1933). Quinn Emanuel argues we should ignore the Djiboutian court order appointing Tadoral because it "is repugnant to U.S. public policy." For support, the firm points to cases where courts refuse to enforce foreign money judgments due to public policy concerns. The district court may need to decide whether this public policy exception to enforcing foreign money judgments extends to foreign court orders concerning the internal affairs

of a corporation. Even if a public policy exception generally applies, would applying it here violate the act of state doctrine? *See, e.g.*, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416 (1964) (holding American courts "will not sit in judgment on the acts of the government of another done within its own territory") (cleaned up); *see also Port de Djib. S.A. v. DP World Djib. FZCO* [2023] EWHC 1189 (Comm) [53] (Eng.) (discussing Port de Djibouti's invocation of the act of state doctrine in a related arbitration). Or, might the Federal Arbitration Act's prohibition on using the act of state doctrine as a reason to refuse "[e]nforcement" or "confirmation of arbitral awards" extend to this procedural issue? 9 U.S.C. § 15.

Finally, for the remedy, if the suit was "*brought* by counsel without authority," then the case should be dismissed "without prejudice" to a future suit "properly brought" by Doraleh. *Pueblo of Santa Rosa*, 273 U.S. at 321 (emphasis added). If the district court finds that Quinn Emanuel had authority to file the petition but has since lost its authority to represent Doraleh, the district court should decide the appropriate remedy.

\* \* \*

In our adversarial system, a party controls the litigation conducted in its name. To preserve that control, courts presented with evidence raising substantial questions about a lawyer's authority should determine whether the party authorized the lawyer's representation. We therefore vacate the judgment and remand for the district court to determine Quinn Emanuel's authority to represent Doraleh.

*So ordered.*

ROGERS, *Senior Circuit Judge*, dissenting: This is an appeal from the confirmation of an international arbitration award. The Republic of Djibouti entered into a contract to build and operate a port. The contract included a broad arbitration clause, Article 20. The majority allows Djibouti to escape forfeiture of an issue that it had the opportunity to present during arbitration and expressly declined. The district court rejected Djibouti's challenge to its subject matter jurisdiction in the confirmation proceeding, recognizing that it was a "disguise" to avoid forfeiture of the same issue during arbitration. So must this court. Accordingly, I respectfully dissent.

## I.

The international commercial arbitration framework was created in response to concerns from businesses and investors in developed states about the absence of predictable and evenhanded mechanisms for international dispute resolution, which presented an impediment to growing international trade. *See* Gary B. Born, 1 INTERNATIONAL COMMERCIAL ARBITRATION 64 (2d ed. 2014). The system of international arbitration traces its roots to the Geneva Protocol on Arbitration Clauses of 1923 and the Geneva Convention for the Execution of Foreign Arbitral Awards of 1927, which together established the principle that arbitral awards are presumptively valid. *Id.* at 67. In 1925, the United States enacted the Federal Arbitration Act, 9 U.S.C. §§ 1–16, to "reverse decades of judicial mistrust in the United States of arbitration and render arbitration agreements enforceable on the same terms as other contracts. From the outset, U.S. judicial decisions embraced the Act's avowedly pro-arbitration objectives." Born,

INTERNATIONAL COMMERCIAL ARBITRATION at 68 (citing *Marine Transit Corp. v. Dreyfus*, 284 U.S. 263 (1932)).

The contemporary legal regime for international arbitration was then "developed in significant part during the second half of the 20th century, with countries from all parts of the globe entering into international arbitration conventions and enacting national arbitration statutes designed specifically to facilitate the arbitral process." *Id.* at 98. Courts then interpreted those international agreements and national legislation, "giv[ing] effect to these legislative instruments, [and] often extending or elaborating on their terms." *Id.* The uniformity of these principles, in turn, gave rise to an "avowedly 'pro-arbitration' regime [that] ensures the enforceability of both arbitration agreements and arbitral awards, gives effect to the parties' procedural autonomy and the arbitral tribunal's procedural discretion[,] and seeks to insulate the arbitral process from interference by national courts or other governmental authorities." *Id.*

A key cornerstone of the development of that system was the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards, also known as the New York Convention:

> [T]he Convention's introduction of uniform international legal standards mandatorily requiring the recognition and enforcement of international arbitration agreements, subject to only specified exceptions, was also a bold advance, as was the Convention's emphatic recognition of the predominant role of party autonomy in the arbitral process. Taken together, the Convention's provisions regarding the recognition of arbitral awards and agreements provided an

international legal framework within which the arbitral proceedings could be conducted largely in accordance with the parties' desires and the arbitrators' directions, and whose results could be effectively enforced in national courts around the world.

*Id.* at 103; *see also Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974).

International commercial arbitration has succeeded in part because of its emphasis on consent and autonomy. "International commercial arbitration is a fundamentally consensual means [for] dispute resolution: unless the parties have agreed to arbitrate, there can be no valid arbitral determinations of their rights." Born, INTERNATIONAL COMMERCIAL ARBITRATION at 97. By agreeing to arbitrate, parties make a trade, giving up "the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985).

The Supreme Court has long recognized the importance of this bargain and the limited judicial role in the confirmation of international commercial arbitration awards that goes with it. This limited role promotes the "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), which "applies with special force in the field of international commerce." *Mitsubishi Motors*, 473 U.S. at 631. After all, "[t]he preeminent concern of Congress in passing the [Federal Arbitration] Act was to enforce private agreements into which parties had entered," and "requires that [courts] rigorously enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). The Supreme Court emphasized that "we are well past the time when judicial

suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." *Mitsubishi Motors*, 473 U.S. at 626–27. The Court therefore recognized:

> The utility of the [New York] Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own. Doubtless, Congress may specify categories of claims it wishes to reserve for decision by our own courts without contravening this Nation's obligations under the Convention. But we decline to subvert the spirit of the United States' accession to the Convention by recognizing subject-matter exceptions where Congress has not expressly directed the courts to do so.

*Id.* at 639 n.21.

As relevant, the Supreme Court has held that the meaning and application of procedural issues normally decided by a forum-based decisionmaker, including waiver, time limits, notice, laches, and estoppel, are to be decided by the arbitrators if they serve as a precondition of arbitration. *See, e.g.*, *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 86 (2002); *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34–35 (2014); *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 25. And, in keeping with the Supreme Court's guidance, this court has noted that "'judicial review of arbitral awards is extremely limited' and . . . [the court] 'do[es] not sit to hear claims of factual or legal error by an arbitrator as [it would] in reviewing decisions of lower courts.'" *Teamsters Loc. Union No. 61 v. United Parcel Serv., Inc.*, 272 F.3d 600, 604 (D.C. Cir. 2001) (quoting *Kanuth*

*v. Prescott, Ball & Turben, Inc.*, 949 F.2d 1175, 1178 (D.C. Cir. 1991)); *see also Burchell v. Marsh*, 58 U.S. (17 How.) 344, 348 (1855).

Accordingly, confirmation proceedings under the New York Convention are quite narrow.  The treaty generally "obligates participating countries to honor international commercial arbitration agreements and to recognize and enforce arbitral awards rendered pursuant to such agreements." *Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 324 (D.C. Cir. 2014) (citing N.Y. CONV'N Arts. I, II, III). Confirmation proceedings, as this court has long recognized, are not vehicles to relitigate issues in the arbitration, and signatory nation courts may only decline confirmation based on seven defenses enumerated in Article V of the Convention.  *See TermoRio S.A. E.S.P. Grp., LLC v. Electranta S.P.*, 487 F.3d 928, 933–35 (D.C. Cir. 2007).

For similar reasons of finality and efficiency, our sister circuits have held that arguments not brought before the arbitrators are forfeited.  *See, e.g.*, *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir. 1998); *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Loc. 731*, 990 F.2d 957, 961 (7th Cir. 1993).  The Seventh Circuit explained that "[p]ermitting parties to keep silent during arbitration and raise arguments in enforcement proceedings would undermine the purpose of arbitration which is to provide a fast and inexpensive method for the resolution of . . . disputes." *Nat'l Wrecking*, 990 F.2d at 960–61 (quotations and citations omitted).

## II.

The district court properly performed its narrow role in the arbitration award confirmation proceeding. Although Djibouti characterizes its objection to confirmation as a challenge to Quinn Emanuel's authority to represent Doraleh Container Terminal ("DCT"), Appellant's Br. 31, the district court recognized this was a collateral attack presenting the issue whether the provisional administrator, or DCT's pre-expropriation board of directors, had authority over DCT. *Doraleh Container Terminal SA v. Republic of Djibouti*, 656 F. Supp. 3d 223, 233 (D.D.C. 2023).

In addressing whether DCT was a party under 9 U.S.C. § 207, the district court noted that when the provisional administrator challenged Quinn Emanuel's authority to continue to represent DCT in the arbitration proceedings, the law firm submitted evidence to the arbitral panel showing its authority had been approved by DCT's pre-expropriation board of directors. *Id.* at 232–33. Djibouti's authority objection to DCT "str[uck] the [district court] as a disguised attempt to challenge the award on grounds that could have been brought before the arbitrator, rather than an authentic" jurisdictional challenge. *Id.* at 233. For "[d]espite an invitation from the arbitral tribunal to comment on DCT's authority, Djibouti declined to respond, and instead raises its argument [in the federal court] for the first time." *Id.*

The district court explained, correctly, that it was not its "job to engage with questions that could have been addressed before the arbitrator," citing the "extremely limited" nature of confirmation proceedings and the principle that "[i]f a party fails to raise an issue . . . to the arbitrators, that issue is forfeited." *Id.* (alterations in original) (internal quotations and citations omitted). Instead, "[i]f Djibouti wanted to dispute

DCT's authority to bring a claim, it needed to do so before the arbitrator[s]," not by "disguis[ing]" its argument as a jurisdictional challenge. *Id.* Further, the district court explained, it could not consider Djibouti's authority challenge as an "independent ground" to deny confirmation because authority is not one of the enumerated defenses under the New York Convention. *Id.* at 233–34 (citing *TermoRio*, 487 F.3d at 935).

In rejecting the district court's analysis, the majority overlooks three key facts.

First, the Concession Agreement that Djibouti entered with DCT when securing foreign investment for the port project included Article 20. Article 20 provides that "any dispute" or "claims" in "any way connected with" its contractual terms, "rights, duties or liabilities" would be subject to arbitration "under the Rules of Arbitration of the London Centre for International Arbitration" and that any arbitral award would be "final and binding." Concession Agreement, Art. 20 at 61 (Oct. 30, 2006). Djibouti has not challenged the scope or validity of Article 20 in its agreement to arbitrate. *See* Appellant's Br. 16 & n.4. Djibouti itself invoked Article 20 in availing itself of the arbitral forum when it initiated this arbitration in 2014 seeking to void the Concession Agreement. Djibouti Amend. Req. for Arb. (Aug. 7, 2014).

Second, the same authority challenge that Djibouti now presents was ripe during the arbitration proceedings and Djibouti was given opportunities by the arbitral panel to present its challenge to Quinn Emanuel's authority to represent DCT. Djibouti repeatedly declined. A brief timeline is telling.

Djibouti expropriated DCT in February 2018, seizing physical control of the port terminal facilities and expelling the

operating company and personnel from the country. At that time, Djibouti purported to assume control of DCT and to unilaterally revoke the Concession Agreement. Djibouti acting *ex parte* obtained an order in September 2018 from a Djibouti court indefinitely replacing DCT's board members and appointing Chantal Tadoral as provisional administrator of DCT.

On November 9, 2018, the arbitral panel convened to address Djibouti's petition for arbitration held a hearing on DCT's breach-of-contract counterclaims. Consideration of the counterclaims had been stayed since 2016 to allow commercial settlement discussions. DCT was represented by the "Quinn Emanuel" law firm ("QE"), which had represented DCT in the arbitral proceedings since 2014 and had obtained in September 2018 an English sovereign court order against the removal of the members of DCT's board of directors. QE Ltr. to Arbitrators at 3–4 (Oct. 6, 2018). On November 19, Administrator Tadoral wrote the arbitral panel to request a stay of the arbitration proceedings, copying Djibouti's counsel. Admr. Tadoral Ltr. to Arbitrators (Nov. 19, 2018). In the letter, Administrator Tadoral represented that she had revoked Quinn Emanuel's authorization to pursue the counterclaims and that a corporate governance dispute was ongoing in a Djibouti court with DCT's pre-existing board. Quinn Emanuel promptly responded, referencing as evidence of its authority an English law power-of-attorney agreement entered by DCT's pre-existing board of directors and re-ratified in 2016, and arguing Administrator Tadoral's appointment was invalid and she lacked authority to revoke the power-of-attorney agreement. *See* QE Ltr. to Arbitrators (Nov. 26, 2018).

The arbitral panel thereupon invited Djibouti and Administrator Tadoral to respond to Quinn Emanuel's evidence of authority to represent DCT and challenges to the

Administrator's authority. Emails (Nov. 30 & Dec. 1, 2018). Djibouti's counsel acknowledged receipt of the request but did not file a substantive response. *Id*. A few days later Quinn Emanuel sent a second letter to the arbitral panel emphasizing, among other things, the breadth of the issues that Djibouti agreed to arbitrate in Article 20, including "any dispute" regarding DCT's structure and governance. *See* QE Ltr. to Arbitrators (Dec. 4, 2018).

The arbitral panel once more invited Djibouti and Administrator Tadoral to respond to Quinn Emanuel's challenges to Administrator Tadoral's authority. Email (Dec. 17, 2018). In particular, the arbitral panel invited submissions on whether Djibouti law, or else English law, governed the validity of Administrator Tadoral's appointment, and if Djibouti law governed, whether Administrator Tadoral's appointment was valid under Djibouti law. *Id*. If Administrator Tadoral's appointment was valid, then the counterclaims presumably would be dismissed. Again, Djibouti acknowledged receipt of the invitation but still did not file a substantive response. Email (Dec. 18, 2018). Quinn Emanuel sent a third letter responding to the arbitral panel's queries, stating that English law, not Djibouti law, governed the validity of Administrator Tadoral's appointment, and that under Djibouti law Administrator Tadoral's provisional powers would not authorize her to revoke its authority to represent DCT in the arbitration proceedings. *See* QE Ltr. to Arbitrators (Dec. 24, 2018).

On January 3, 2019, the arbitral panel denied Administrator Tadoral's application for a stay, referencing the absence of a request for an arbitral determination of Administrator Tadoral's authority. It did not state or imply that Administrator Tadoral's request for a stay came too late for the arbitral panel to decide whether she and not Quinn Emanuel

had authority over DCT's counterclaims against Djibouti. Acknowledging there was a continuing "major dispute" regarding "the validity" of Administrator Tadoral's appointment and authority over DCT, the arbitral panel pointed out that under the London Court of International Arbitration ("LCIA") rules, it had "the power to decide on procedural matters relating to the conduct of the arbitration." Decision ¶ 7 (Jan. 3, 2019) (citing LCIA Rules 14, 23; United Kingdom Arbitration Act 1996 c.23, §§ 33–34). Given all the circumstances, the arbitral panel decided that "it should NOT stay the proceedings now." *Id*. ¶ 8. Specifically, the arbitral panel had "not been invited to decide on the question of the validity of" Administrator Tadoral's appointment, the "arbitration had proceeded, without challenge from [Djibouti] or [Administrator] Tadoral to the stage of a hearing" on DCT's counterclaims, and "no further participation by either side was required" as all that was left was to deliver the award. *Id*.

Third, the first time Djibouti presented argument to challenge Quinn Emanuel's authority to represent DCT was in 2021 during the confirmation proceeding before the district court. The arbitral panel issued the awards in 2019, and for the next two years neither Djibouti nor Administrator Tadoral sought an arbitral determination of Quinn Emanuel and Administrator Tadoral's respective authorities through a request for reconsideration or a new petition for arbitration. Djibouti does not point to any impediment to arbitrating the authority challenge. Nor apparently do my colleagues who would order the district court on remand to "accept any motions to compel arbitration" on either "Quinn Emanuel's authority to represent" DCT or Administrator "Tadoral's authority to act on behalf of" DCT. Maj. Op. at 15.

Within the international arbitration system, then, Djibouti forfeited the challenge to Quinn Emanuel's authority to

represent DCT on the counterclaims against Djibouti. The majority avoids this reality by ignoring both the substantial financial liability confronting Djibouti in the arbitration proceedings due to DCT's counterclaims, and Djibouti's silence in the face of the arbitral panel's invitations to respond to Quinn Emanuel's evidence of authority and argument that Administrator Tadoral lacked authority — as if Djibouti had never agreed to Article 20 in the Concession Agreement. And the majority excuses Djibouti's repeated forfeitures of the authority challenge by inventing a rationale not found in the arbitral panel's decision denying the stay. *Id.* at 12. As the district court found, Djibouti now seeks to avoid the consequences of forfeiture by "disguis[ing]" its challenge as procedural and jurisdictional objections. *Doraleh Container*, 656 F. Supp. 3d at 233. The majority offers no logical reason why this court should condone Djibouti's patent "disguise."

### III.

Despite the district court's careful analysis, the majority concludes that "the district court should have determined Quinn Emanuel's authority to represent [DCT]." Maj. Op. at 9. My colleagues depart from the Supreme Court's guidance for arbitration by creating a procedural means for Djibouti to continue to delay and frustrate the enforcement of valid arbitral awards. Such a result is novel, unsupported by precedent, and contrary to long-established principles and the purposes underlying international arbitration.

### A.

District courts possess the "power, at any stage of the case, to require an attorney, one of its officers, to show his authority to appear." *Pueblo of Santa Rosa v. Fall*, 273 U.S. 315, 319 (1927). But this inherent authority of the district court is

distinct from a jurisdictional duty to "always grant[]" a party motion for an elaborate inquiry into attorney authority. Maj. Op. at 7 (quotations and citations omitted). Precedent relied on by the majority from the Supreme Court and this court emphasizes that the "power to inquire" into attorney authorization, including "the time and manner of calling for the authority, and . . . the remedy" is left to the "discretion of the court and *ought to be adapted to the case*." *Pueblo of Santa Rosa*, 273 U.S. at 319 (quoting *King of Spain v. Oliver*, 14 F. Cas. 577, 578 (C.C.D. Pa. 1810) (emphasis added)). So too in *Booth v. Fletcher*, 101 F.2d 676, 683 (D.C. Cir. 1938), and *McLean v. Burkinshaw*, 107 F.2d 665, 665 (D.C. Cir. 1939), this court recognized that power is not to be exercised in an "arbitrary" manner but allows for "discretion" to adapt an analysis of an attorney's authority to the context of a particular case. That is what the district court did here and the majority fails to do, ignoring Djibouti's action or lack thereof during the arbitration proceedings.

The majority states as a principle of settled law that "[w]hen a party requests the court inquire into the lawyer's authority and presents evidence showing 'sufficient ground to question the authority,' the request is 'always granted.'" Maj. Op. at 7 (quoting *W.A. Gage & Co. v. Bell*, 124 F. 371, 380 (W.D. Tenn. 1903)). It relies primarily on two state court cases from 1838 and 1840, neither of which supports such a rigid rule. *McKiernan v. Patrick*, 5 Miss. (4 Howard) 333, 335 (1840), states that an inquiry into attorney authorization may be granted if the court believes it "necessary for the ends of justice." *Tally v. Reynolds*, 1 Ark. 99, 104 (1838), states that if a party moving to challenge the authority of opposing counsel has alleged facts "sufficient to raise a reasonable presumption that the attorney is acting in the case without authority," the court may require the attorney representing his adversary to show his authority. In that case, the attorney was unauthorized

because he had provided "no . . . evidence whatsoever" of any client authorization for the representation. *Id.* at 106. Like *Pueblo of Santa Rosa*, these state court cases emphasize a court's discretion to evaluate context and equitable considerations, *see McKiernan*, 5 Miss. at 335, and when considering party motions to conclude if the challenged attorney can offer no evidence of authorization to act that the representation was unauthorized, *Tally*, 1 Ark. at 104, 106.

Perhaps most disturbing is the majority's conclusion that it is irrelevant that Djibouti failed to challenge Quinn Emanuel's authority over DCT during arbitration. The majority states that "[c]hallenges to a lawyer's authority . . . are not subject to the standard forfeiture rules" and can be raised for the first time on appeal. Maj. Op. at 9, 11. For support the majority looks to the statement in *Pueblo of Santa Rosa* that a court has the "power to inquire" into attorney authorization "at any stage of the case." 273 U.S. at 319. But whether a court may exercise inherent authority to address an issue is different from whether a party seeking to raise the issue can forfeit it. *Pueblo of Santa Rosa* addresses judicial power to inquire into attorney authorization, not when a party may raise an objection to attorney authority or, more relevantly, whether a party can forfeit that issue. The Supreme Court's relevant guidance — to consider "the time and manner" of raising a question of attorney authority "ought to be adapted to the case," *id.* (citation omitted) — is ignored by the majority.

Troubling too, the majority views the district court as declining to determine whether DCT authorized Quinn Emanuel to file the petition for enforcement. *See* Maj. Op. at 9, 14. The district court neither refused to inquire into Quinn Emanuel's authority nor treated the law firm as authorized in the absence of any supporting evidence. The district court noted that Quinn Emanuel had represented DCT from the

outset of the arbitration. Quinn Emanuel's emails to the arbitral panel setting forth the authorizations to act on behalf of DCT were before the district court. The district court confirmed Djibouti had an opportunity to challenge Quinn Emanuel's authority during arbitration, *Doraleh Container*, 656 F. Supp. 3d at 233, being aware that Djibouti had declined the arbitral panel's invitations to challenge Quinn Emanuel's evidence by way of its power of attorney agreements approved by DCT's pre-expropriation board of directors. So this is not a case where an attorney appeared before the federal court without presenting evidence of authorization to act. *Cf. King of Spain*, 14 F. Cas. at 578.

To the extent Djibouti would point to the expropriation of DCT as undermining Quinn Emanuel's authority, the district court did not abuse its discretion. The arbitral panel recognized that the question of who had authority to control DCT's counterclaims against Djibouti was a complex matter of foreign corporate governance law and pointed to its authority to decide the question. Yet although committed under Article 20 to arbitrate such corporate governance issues, Djibouti repeatedly declined to challenge Quinn Emanuel's authority and arguments despite opportunities offered by the arbitral panel. Consistent with its statutorily limited role in arbitral enforcement proceedings, the district court properly concluded that it would not consider Djibouti's "disguised" corporate governance challenge. Again, this is the type of contextual inquiry called for by *Pueblo of Santa Rosa*, 273 U.S. at 319, and *Booth*, 101 F.2d at 683, and left to the district court's discretion in light of time and manner adapted to the context of the case.

15

**B.**

Furthermore, the majority overlooks longstanding congressional instruction and precedent holding that proceedings to confirm arbitral awards are narrow. *See* Part I, *supra*; 9 U.S.C. § 207. The majority's response is that the "New York Convention does not abrogate . . . procedural rule[s]" regarding attorney authority. Maj. Op. at 13. But the question whether petitions to enforce arbitral awards must be heard consistent with procedural rules like the Federal Rules of Civil Procedure is not at issue in this case. As noted, the Supreme Court has repeatedly emphasized that agreements to arbitrate create a binding and exclusive forum where matters relating to waiver, estoppel, and similar defenses are decided by the arbitrators as a precondition of arbitration. *See, e.g.*, *Dean Witter*, 537 U.S. at 86; *BG Grp.*, 572 U.S. at 34–35; *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25. If it is "procedural," then the question whether Quinn Emanuel is authorized to represent DCT is a precondition to arbitration.

The majority insists that even applying the forfeiture rules that govern arbitration, no forfeiture occurred here. Maj. Op. at 11. According to the majority, "Djibouti could not have challenged Quinn Emanuel's authority as a defense during arbitration" because Administrator "Tadoral did not purport to terminate Quinn Emanuel's authority to represent [DCT] until after the firm's work on the merits of the arbitration was complete." *Id.* This summary does not conform with the record. As the arbitral panel recognized in 2019, Djibouti was facing substantial financial liability under DCT's counterclaims and exercised apparent control over Administrator Tadoral with respect to seeking a stay of the arbitration and advising the arbitral panel she controlled DCT. *See* Cabinet Ghaleb Email to Admr. Tadoral (Nov. 14, 2018).

Still Djibouti failed before the arbitral panel to challenge Quinn Emanuel's showing of authority.

Notably, Djibouti does not distinguish between Administrator Tadoral's authority during the arbitration proceedings and that authority at enforcement before the district court, asserting that Administrator Tadoral's power to revoke Quinn Emanuel's authority to represent DCT has been exclusive "[s]ince 2018." Appellant's Br. 21 (quoting Admr. Tadoral's Sec. Decl. at 2). In November 2018, Administrator Tadoral informed the arbitral tribunal she had revoked Quinn Emanuel's authority to pursue DCT's counterclaims in the arbitration proceeding. So, an assertion of a subsequent revocation of Quinn Emanuel's authority to represent DCT presents no distinct challenge that Djibouti could not have raised during arbitration. To the arbitral panel the resolution of whether Administrator Tadoral or Quinn Emanuel had authority to control DCT seemed a precondition to arbitrating the counterclaims. Djibouti repeatedly chose not to challenge Quinn Emanuel's authority before the arbitral panel.

Even viewing the authority challenge as "procedural" on the majority's terms offers no basis to conclude application of the forfeiture doctrine would be barred here. *See, e.g.*, *Fox v. District of Columbia*, 83 F.3d 1491, 1496 (D.C. Cir. 1996). Under the Federal Rules of Civil Procedure, other similar "authority" defenses are treated as affirmative defenses that can be waived or forfeited. *See* FED. R. CIV. P. 9(a)(1)–(2); 5A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1295 (4th ed. 2018); *cf.* Maj. Op. at 6 & n.3.

## C.

The majority's approach undermines the finality and purposes of international arbitration. *See, e.g.*, *Nat'l Wrecking*,

990 F.2d at 960–61. Djibouti agreed to arbitrate as part of soliciting foreign investment and availed itself of the arbitral forum to pursue its claims and forfeited the related issue of who has authority over the foreign investors of DCT. *See Mitsubishi Motors*, 473 U.S. at 628, and Part I, *supra*. The majority, by excepting Djibouti's authority challenge from the principle that matters committed to arbitration must be decided by the arbitrators, affords Djibouti another way to delay enforcement of DCT's awards. Viewed globally, the majority's approach disrupts the balance underpinning international arbitration and economic development. Other arbitral defendants may mimic the use of "disguise[s]" to avoid forfeiture, and investors, in turn, will realize the protection and efficiency of arbitration are at risk. Treaty, statutory, and Supreme Court authority emphasize the importance of finality and enforceability of arbitral awards. The majority ignores that imperative.

To the extent the majority concludes our disagreement is "rather narrow," Maj. Op. at 12 n.8, the potential effect of its approach is not. Challenges to an attorney's authority may be made at any time. But if, as here, that challenge was forfeited during arbitration, there is no basis to inquire further. *See id.* at 7 n.4. This is not a case where a party to arbitration lacked notice or opportunity to challenge attorney authority during arbitration, nor where the district court ignored the question of attorney authority. To be clear: It is not the context of international arbitration that precludes the district court from dismissing a petition to enforce an arbitral award for lack of attorney authority to represent the petitioner but the majority's novel approach, which ignores Djibouti's forfeiture under an agreement to arbitrate and overlooks the potential negative consequences for international arbitration that other circuits have recognized.

Accordingly, I respectfully dissent.